ORIGINAL

FILED-USDC-NDTX-DA
'26 OCT 15 PM12:29

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

---

GEOFFREY PRADIA and KASSI PRADIA,

Plaintiffs,

v.

CITY OF GARRETT, TEXAS; ELLIS COUNTY, TEXAS; BRUCE (BRAD) NORMAN, individually; MICHAEL CARTER, individually; LIEUTENANT SPENCER BREWER, individually; CORPORAL JACOB HOUSTON, individually; DEPUTY TRACY HIGHTOWER, individually; INVESTIGATOR MICHAEL POTEMPA, individually; SERGEANT JOSEPH FITZGERALD, individually; and MAYOR MATT NEWSOM, individually,

Defendants.

---

Civil Action No. 3-26CV3609-Z

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**

(42 U.S.C. § 1983)

**JURY TRIAL DEMANDED**

Plaintiffs Geoffrey Pradia and Kassi Pradia, proceeding pro se, bring this action pursuant to 42 U.S.C. § 1983 against Defendants for deprivation of rights secured by the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and allege as follows:

## I. JURISDICTION AND VENUE

1. This action arises under 42 U.S.C. § 1983 and the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

2. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all events giving rise to Plaintiffs' claims occurred in Ellis County, Texas, which lies within the Northern District of Texas, Dallas Division.

## II. PARTIES

### A. Plaintiffs

3. Plaintiff Geoffrey Pradia is an individual whose family home is located at 401 W. Wyatt Street, Garrett, Ellis County, Texas, which Plaintiffs hold under a rent-to-own agreement. His current mailing address is 4054 County Road 3323, Greenville, Texas 75402. Geoffrey Pradia is an African American man. The Pradia family is an interracial household — Geoffrey Pradia is Black and Kassi Pradia is White and Native American. This fact is set forth as background context and is directly relevant to Plaintiffs' Equal Protection claims, to Deputy Hightower's inquiry on May 29, 2026 as to whether Plaintiffs believed Holdridge's conduct was motivated by race or ethnicity, and to Plaintiffs' reservation of rights regarding race and ethnicity-based claims as further described herein. Until his resignation on June 26, 2026, he was employed as a licensed Peace Officer and Sergeant with the Garrett Police Department, and he was the sole financial provider for the Pradia household. Since May 29, 2026 — a period of approximately four and one-half months as of the filing of this Complaint — Geoffrey Pradia has been unable to work in law enforcement and has not obtained employment with any law enforcement agency, as described in Part III.J below.

4. Kassi Pradia is a stay-at-home mother responsible for the full-time care of four minor children, including an infant who was thirteen months old and nursing on May 29, 2026, and does not work outside the home. Chief Carter was personally aware of this family structure — that Geoffrey Pradia was the household's only source of income, that Kassi Pradia did not work outside the home, and that there was no secondary income to absorb any disruption to Geoffrey Pradia's wages or employment. Chief Carter was specifically aware of the off-duty hours Geoffrey Pradia worked at Point Blank Safety and understood that those hours served the purpose of ensuring the family's financial obligations were met. This awareness is directly relevant to the economic coercion and punitive damages analyses set forth in the causes of action below. Geoffrey Pradia holds a Texas Peace Officer Intermediate Proficiency Certificate issued by the Texas Commission on Law Enforcement (TCOLE), reflecting advanced training and demonstrated proficiency in law enforcement practices including but not limited to child abuse investigation, constitutional law, search and seizure, and use of force.

5. Geoffrey Pradia has approximately eight years of law enforcement experience accumulated across multiple law enforcement agencies, giving him broad professional exposure to the varying policies, procedures, and enforcement cultures of different departments. His intermediate certification and his tenure as a sworn Sergeant with the Garrett Police Department give him direct, firsthand knowledge of that department's written and unwritten policies, customs, and enforcement practices. In addition, Geoffrey Pradia has worked directly and collaboratively with investigators from the Ellis County Sheriff's Office in the course of his duties, giving him professional familiarity with the Ellis County Sheriff's Office's policies, procedures, and customs as they are applied in practice. During the course of his law enforcement career, Geoffrey Pradia has personally investigated and responded to multiple cases

involving outcries of child abuse made directly by children to law enforcement, as well as cases in which abuse was alleged but no outcry by the child occurred.

6. This experience gives him direct professional familiarity with the standard investigative practices, protocols, and legal standards governing child abuse investigations under Texas law, including the provisions of the Texas Penal Code and Texas Family Code governing abuse, neglect, and the rights of parents and children during such investigations. Based on that professional experience, Geoffrey Pradia is able to affirmatively allege that the investigation conducted on May 29, 2026 departed materially from standard investigative practice, that the absence of any outcry by the Pradia children was a significant factor that standard protocol would have required investigators to weigh before escalating the investigation, and that the warrantless entry, the physical seizure of Kassi Pradia, and the interview of the children without parental consent were inconsistent with both the legal standards and the established professional practices governing child abuse investigations in Texas. This professional knowledge and experience is directly relevant to Plaintiffs' Monell claims and their assertions regarding the departure from established policy and proper procedure that occurred on May 29, 2026 and June 3, 2026.

7. Before the events described in this Complaint, Geoffrey Pradia was a decorated peace officer. He was named Officer of the Year by the Garrett Police Department in 2025, was named Employee of the Month at another law enforcement agency, and received two life-saving awards, one from the Garrett Police Department and one from another police department. He rose to the rank of Sergeant with the Garrett Police Department and received multiple promotions and pay raises during his time there. Plaintiffs allege that the events described in this Complaint have destroyed the career of a decorated officer.

8. Plaintiff Kassi Pradia is an individual whose family home is located at 401 W. Wyatt Street, Garrett, Ellis County, Texas, which Plaintiffs hold under a rent-to-own agreement. Her current mailing address is 4054 County Road 3323, Greenville, Texas 75402. She is the wife of Plaintiff Geoffrey Pradia and a co-plaintiff in her individual capacity for constitutional violations committed against her directly. On May 29, 2026, Kassi Pradia was the breastfeeding mother of a thirteen-month-old infant. This fact is directly relevant to the nature and severity of the harms she suffered as a result of Defendants' unlawful conduct on May 29, 2026: the forcible seizure of a nursing mother and her forced separation from her nursing infant without any lawful basis caused immediate and foreseeable physical discomfort to Kassi Pradia and urgent distress to the infant. Chief Carter was personally aware of Kassi Pradia's vulnerability, past trauma, and legal history at the time he directed and participated in the events described herein, and that awareness is directly relevant to the objective unreasonableness of his conduct and to the punitive damages analysis set forth in the causes of action below.

**B. Defendants**

9. Defendant City of Garrett, Texas is a municipal corporation organized under Texas law, responsible for the policies, customs, and practices of the Garrett Police Department and its officers.

10. Defendant Ellis County, Texas is a governmental entity organized under Texas law, responsible for the policies, customs, and practices of the Ellis County Sheriff's Office.

11. Defendant Bruce "Brad" Norman is the duly elected Sheriff of Ellis County, Texas and the final policymaker for the Ellis County Sheriff's Office. He is sued in his individual capacity. At all relevant times, he acted under color of state law and bears supervisory

responsibility for the policies, customs, training, and conduct of the Ellis County Sheriff's Office and its personnel.

12. Defendant Michael Carter is the Chief of Police of the Garrett Police Department. He is sued in his individual capacity. At all relevant times, he acted under color of state law and as a final policymaker for the Garrett Police Department.

13. Defendant Lieutenant Spencer Brewer is an officer of the Garrett Police Department. He is sued in his individual capacity. At all relevant times, he acted under color of state law.

14. Defendant Corporal Jacob Houston is a deputy of the Ellis County Sheriff's Office. He is sued in his individual capacity. At all relevant times, he acted under color of state law.

15. Defendant Deputy Tracy Hightower is a deputy of the Ellis County Sheriff's Office. He is sued in his individual capacity. At all relevant times, he acted under color of state law.

16. Defendant Investigator Michael Potempa is an investigator with the Ellis County Sheriff's Office. He is sued in his individual capacity. At all relevant times, he acted under color of state law.

17. Defendant Sergeant Joseph Fitzgerald is a sergeant with the Ellis County Sheriff's Office. He is sued in his individual capacity. At all relevant times, he acted under color of state law.

18. Defendant Mayor Matt Newsom is the Mayor of the City of Garrett, Texas. He is sued in his individual capacity. At all relevant times, he acted under color of state law and directed or ratified certain enforcement actions described herein.

## III. FACTUAL ALLEGATIONS

### A. Background: The Pradia Family and Their Neighbor Josie Holdridge

19. Plaintiffs Geoffrey and Kassi Pradia are a married couple whose family home is located at 401 W. Wyatt Street, Garrett, Ellis County, Texas, which they hold under a rent-to-own agreement. Plaintiffs' current mailing address is 4054 County Road 3323, Greenville, Texas 75402. Geoffrey Pradia is a licensed Peace Officer who, until his resignation on June 26, 2026, was employed as a Sergeant by the Garrett Police Department.

20. Josie Holdridge resides at 405 W. Wyatt Street, directly adjacent to Plaintiffs' residence. Holdridge had a longstanding and well-documented history of hostility toward Plaintiffs, including: recording Plaintiffs' property; posting videos online disparaging the Pradia family; filing repeated complaints with City officials; using her position as a sitting Garrett City Council member to apply pressure against Plaintiffs; and arranging for her roommate to publicly disclose, in a post to a community social media group, the location of Plaintiffs' home while identifying Geoffrey Pradia as a law enforcement officer — although the post did not state the street address — thereby placing the Pradia family at increased safety risk. In furtherance of this campaign, Holdridge posted a video to the social media platform TikTok and commented on that video in her capacity as a sitting Garrett City Council member, expressly stating that she intended to use her position on the City Council to prevent Plaintiffs from building on adjacent property they had purchased.

21. This public statement, made by Holdridge while identifying herself as a Council member, constituted a direct and documented threat to weaponize governmental authority against Plaintiffs. Both Chief Carter and Mayor Newsom had actual knowledge of Holdridge's Council membership, her public statements made in that capacity, and her declared intention to use her official position to harm Plaintiffs' property interests. Their awareness of this documented

retaliatory posture is directly relevant to their subsequent decisions to act upon Holdridge's complaints while systematically refusing to act upon any complaint made by Plaintiffs.

22. Upon information and belief, Holdridge maintained an ongoing, direct relationship with Mayor Newsom and frequently complained to him directly, by text message, about the Pradia family. Upon information and belief, multiple text messages between Holdridge and Mayor Newsom will show that Holdridge complained to Mayor Newsom directly and often about Plaintiffs, and that Mayor Newsom, after receiving those complaints, directed Chief Carter to take enforcement action against Plaintiffs. These communications are within the possession of the City of Garrett, Mayor Newsom, and Holdridge, and are the subject of the preservation notice set forth in Part IV below.

23. On or about February 19, 2026, Chief Carter informed Plaintiff Geoffrey Pradia directly and in person that Mayor Newsom had directed that a citation be issued to Geoffrey Pradia for his dog being at large. This communication is significant for several reasons. First, it establishes that the decision to enforce animal ordinances against Plaintiffs was not made in response to any ordinance violation occurring on or around that date, but was instead a premeditated directive from the Mayor targeting Plaintiffs specifically — months before any of the events Defendants may characterize as a legitimate basis for enforcement. Second, it demonstrates that Chief Carter was acting as a direct instrument of Mayor Newsom's directives with respect to the Pradia family, rather than exercising independent law enforcement judgment.

24. Third, and most significantly, the February 19 directive predates every event in this Complaint that could conceivably be characterized as a lawful trigger for enforcement: it predates the May 1, 2026 phone call between Geoffrey Pradia and Mayor Newsom; it predates the May 26, 2026 dog-at-large incident; it predates Geoffrey Pradia's May 27-28, 2026

employment application to the San Saba County Sheriff's Office; and it predates the May 29, 2026 DFPS investigation. The existence of this February 19 directive, communicated by Chief Carter to Geoffrey Pradia directly, establishes that the enforcement campaign against Plaintiffs was premeditated, targeted, and set in motion by the Mayor himself well before any of the events Defendants may offer as pretextual justification.

25. On March 5, 2026, Plaintiffs sent Holdridge a letter demanding that she move a gas meter that was on Plaintiffs' property and needed to be relocated after Plaintiffs acquired the property under a rent-to-own agreement. The letter angered Holdridge. Her anger was displayed in subsequent social media posts, including posts made when workers came to Plaintiffs' property to move the gas meter. Plaintiffs allege that the City of Garrett, through Mayor Newsom, Chief Carter, and Public Works Director Don Lewis, thereafter retaliated against Plaintiffs, including through the demand for vaccination records and the enforcement actions described in Part III.D below.

26. The City also demanded that Plaintiffs' property be brought up to code. In connection with those demands, Public Works Director Don Lewis made the statement, "I think you're living here now." At the same time, upon information and belief, no City official, including Lewis, took any action to direct Holdridge to bring her own property up to code, although they had actual knowledge that Holdridge had a tenant living in a tiny house behind her residence for which no certificate of occupancy had been issued.

27. On or about May 1, 2026, at approximately 9:13 p.m., Plaintiff Geoffrey Pradia called Mayor Matt Newsom by phone to report Holdridge's harassment, the public disclosure, arranged by Holdridge's roommate, of the location of his home, and Holdridge's social media statement — made while she was a sitting City Council member — that she believed Plaintiffs

were abusing their children. Geoffrey Pradia specifically informed Mayor Newsom that Holdridge had made this statement in Facebook comments, and that her stated basis for believing child abuse was occurring was not any observation of the Pradia children, not any report from the children themselves, and not any contact with any professional or authority — but solely her personal displeasure arising from a dispute over Geoffrey Pradia's dog having puppies that he was planning to give away. The assertion that a neighbor's disagreement over the disposition of a litter of puppies constitutes a basis for a belief of child abuse is, on its face, so lacking in any rational foundation as to establish that Holdridge's stated belief was not genuine, was pretextual, and was designed solely to threaten and intimidate Plaintiffs.

28. Mayor Newsom was therefore placed on actual notice, as of May 1, 2026, not merely that Holdridge had threatened to make an abuse report, but that the stated predicate for that threat — a dog breeding dispute — was facially irrational and bore no relationship to the welfare of the Pradia children. Geoffrey Pradia further advised Mayor Newsom of the ongoing campaign of harassment, including Holdridge's stated intention to follow through on a report of child abuse. Mayor Newsom, as the direct supervisor of Chief Carter and the head of municipal government, had actual knowledge of Holdridge's retaliatory motive, the irrational basis of her stated belief, and her prior threat to make a false abuse report — all before the events of May 29, 2026. Critically, Holdridge tagged the Garrett Police Department directly in the Facebook post in which she made these statements. The tagging of the Garrett Police Department in that post constitutes direct, institutional notification to the Department — and by extension to Chief Carter as its head — of Holdridge's public statements about her belief that the Pradia children were being abused.

29. This is not a case of a supervisor learning about a social media post through informal channels or secondhand conversation; the Department was formally tagged and therefore directly notified as a matter of social media record. That tag also means the post and the Department's notification of it may be preserved in the Department's social media history and is subject to open records requests and discovery. The following day, on or about May 2, 2026, Chief Carter approached Geoffrey Pradia while he was at work at the Garrett Police Department and made an unsolicited comment that Holdridge's Facebook post had garnered over 700 comments. This statement by Chief Carter is significant on multiple levels. First, it establishes Chief Carter's actual, specific, and contemporaneous knowledge of Holdridge's May 1 Facebook post and its contents — including her public statements about her belief that the Pradia children may be suffering abuse. Chief Carter's awareness of this post was not general or inferential; the Department had been directly tagged in the post, and Carter had monitored it in sufficient detail to reference its comment count to Geoffrey Pradia the very next day.

30. Second, Chief Carter's casual, conversational mention of the post's viral reach — rather than any expression of concern about a potential false abuse report being publicly amplified — demonstrates that Carter did not treat Holdridge's statements as a credible child welfare concern warranting investigation, but rather as a matter of community interest that he chose to raise with Geoffrey Pradia in the normal course of workplace conversation. This is directly inconsistent with any claim that the May 29, 2026 investigation was initiated in good faith based on a credible report of child abuse. Third, the 700-comment reach of Holdridge's post, combined with the direct tagging of the Garrett Police Department, establishes that Holdridge's statements about possible child abuse against the Pradia children were both circulating widely in the Garrett community and officially brought to the Department's attention

— and that Chief Carter was aware of both — weeks before the May 29, 2026 events. Upon information and belief, Chief Carter was also made aware of this prior threat and its pretextual basis through Mayor Newsom, in addition to his own direct institutional knowledge arising from the Department's being tagged in the post.

31. On or about August 5, 2025, Holdridge made a public statement on the social media platform TikTok — specifically in a comment on a video she herself had posted — in which she expressly identified herself as a member of the Garrett City Council and stated that she intended to use her position on the Council to prevent Plaintiffs from building a home on adjacent property they had purchased. This statement was made publicly, under Holdridge's own name, while she held an active seat on the City Council. It constitutes direct evidence that Holdridge was willing to exploit her governmental position as an instrument of personal retaliation against Plaintiffs and that she understood her Council membership to give her leverage over their property rights and development plans. Both Chief Carter and Mayor Newsom had actual knowledge of Holdridge's Council membership and, upon information and belief, had actual or constructive knowledge of this public statement and the retaliatory intent it expressed.

32. By the time of the May 29, 2026 events, Holdridge was no longer a sitting member of the Garrett City Council; however, her prior statements made while in that position — including this TikTok comment expressly invoking her Council authority — establish her documented retaliatory motive, her pattern of weaponizing governmental relationships against Plaintiffs, and the actual knowledge that Chief Carter and Mayor Newsom possessed regarding her character and intent well before they chose to act upon her May 29, 2026 abuse report.

## B. Third-Party Manipulation of the Pradia Children (Early May 2026)

33. In early May 2026, Amanda Dewart ("Dewart"), a half-sister of Plaintiff Kassi Pradia and the aunt of the Pradia children, relocated from Caldwell, Idaho to Garrett, Texas, and began spending increasing time with the Pradia children. Plaintiffs were unaware of the nature or substance of Dewart's communications with the children during this period.

34. Beginning in early May 2026 and continuing through May 29, 2026, Dewart engaged in a sustained, deliberate campaign of psychological manipulation directed at the Pradia children, which included: (a) repeatedly telling the children that lawful corporal discipline was "abuse"; (b) instructing them to report to neighbors or call police or CPS "if anything happened"; (c) instructing the children not to disclose these conversations to their parents, and threatening that they would be "beaten super super bad" if the parents found out; (d) telling the children that CPS would take them if they did not report; (e) telling the children that Geoffrey Pradia would "molest" them; (f) stating that Kassi Pradia would "never get her pardon"; (g) stating that Geoffrey Pradia "can't hide behind his badge"; (h) instructing the children to run to neighbor Josie Holdridge and ask her to call police; (i) instructing them to beg deputies to call CPS; (j) instructing the oldest child to jump from a moving vehicle at a gas station and run to a trucker and ask him to "beat Geoffrey up"; (k) discouraging the children from their family's religious practices; (l) manipulating sibling relationships by expressing preferences for one child over another; (m) confiscating Mother's Day gifts and causing the children to discard cards they had made for Kassi Pradia; and (n) threatening the children that, if they did not go to the neighbor and ask the neighbor to call the police, Dewart would cause their parents to be "locked up and gang raped."

35. During the period of May 25-28, 2026, Plaintiffs informed Dewart and her husband, Thomas Steurer ("Steurer"), that the family was planning to relocate to San Saba,

Texas, as Geoffrey Pradia had been offered a potential law enforcement position there. Dewart used this information to increase the urgency of her manipulation, telling the children they had to report “before the move” because CPS would not be able to find them afterward.

36. By May 29, 2026, Plaintiffs were entirely unaware of Dewart’s manipulation. The children had been conditioned over several weeks to believe they were in danger, to distrust their parents, to fear CPS, and to take specific actions — including running to Holdridge and urging her to call police — before the family moved. The children also feared that, if they did not go along with what their aunt, Dewart, told them to do, their parents would be “hurt,” “locked up,” and “gang-raped.”

### C. Geoffrey Pradia’s Application to San Saba County Sheriff’s Office (May 27–28, 2026)

37. On May 27, 2026, Geoffrey Pradia submitted an employment application to the San Saba County Sheriff’s Office for a law enforcement position. Geoffrey Pradia was seeking to transition to a new agency on good terms, consistent with his professional standing as a licensed Peace Officer.

38. On May 28, 2026 — one day before the events of May 29, 2026 — Geoffrey Pradia informed Chief Carter of the application and requested a copy of his high school diploma from his personnel file to include with his application documents. Chief Carter was therefore aware, on the eve of all subsequent investigations and adverse employment actions, that Geoffrey Pradia was actively seeking employment with another law enforcement agency and intended to depart the Garrett Police Department.

### D. Selective and Retaliatory Enforcement of City Ordinances (May 12, May 26, and July 2026)

39. During his service as a Garrett police officer, Geoffrey Pradia responded to multiple "dog at large" complaints and "dog bite" complaints, and responded to at least one incident in which a citizen fired a warning shot at a dog that was at large. None of the owners of those animals was ever required to produce vaccination records or otherwise comply with a vaccination demand, and Geoffrey Pradia was never directed by Chief Carter or any other supervisor to obtain vaccination records from the owners of animals that were the subject of such complaints.

40. On May 12, 2026, at approximately 1:30 p.m., Chief Carter informed Geoffrey Pradia at the Garrett Police Department that he needed to bring his dogs into vaccination compliance and his property into compliance, citing Public Works Director Don Lewis and the Mayor. This demand was not a routine enforcement action. Prior to this date, the City of Garrett had never requested vaccination records from Geoffrey Pradia in connection with any animal ordinance matter, nor, upon information and belief, had the City systematically requested vaccination records from other Garrett residents in connection with animal ordinance enforcement. The vaccine records demand originated not from any independent enforcement decision by the Garrett Police Department, but was directly triggered by Josie Holdridge, who raised the issue of the Pradia family's dogs' vaccination status with Public Works Director Don Lewis after Geoffrey Pradia served Holdridge with a formal notice to relocate a gas meter that was on Plaintiffs' property and needed to be relocated after Plaintiffs acquired the property under a rent-to-own agreement.

41. Holdridge's complaint to Don Lewis — made in direct response to Plaintiffs' assertion of their property rights against her — was then transmitted by Lewis to Chief Carter

and Mayor Newsom, who directed Carter to pursue vaccination compliance enforcement against Plaintiffs. This sequence of events establishes that the vaccine records demand was not a facially neutral enforcement action but was a retaliatory response to Plaintiffs' exercise of their property rights, orchestrated by Holdridge through her relationships with City officials and executed by Chief Carter and Mayor Newsom at her instigation. When Geoffrey explained that the family had made health-related decisions related to their children's vaccine injuries, Chief Carter stated there were "no exceptions."

42. On May 26, 2026, at approximately 8:40 a.m., the Pradia family's dog Macchi briefly escaped the property at 401 W. Wyatt Street through a section of electric fence that had been grounded and rendered temporarily inoperable by recent storm damage — an act of nature entirely outside Plaintiffs' control and not the result of any negligence or deliberate inaction on their part. The history of the fence is directly relevant to the pretextual nature of the citation. When Chief Carter first conveyed Mayor Newsom's directive on or about February 19, 2026, Chief Carter personally purchased and provided Geoffrey Pradia with an electric fence box to assist Plaintiffs in bringing the fence into compliance — a cooperative act that demonstrates Carter's own recognition at that time that the fence issue was a manageable compliance matter rather than a citation-worthy offense, and that stands in stark contrast to his subsequent decision to issue a citation at the Mayor's renewed direction. Following Chief Carter's assistance, Geoffrey Pradia hired a local handyman, Anjel Mendez, who on or about February 23, 2026 performed repairs to the electric fence at 401 W. Wyatt Street.

43. From the completion of those repairs on February 23, 2026 through May 26, 2026, the fence functioned as intended and Macchi did not escape the property. The only exception was weather-related interference, which is consistent with the known limitations of

electric fencing systems and does not reflect any failure of maintenance or reasonable care by Plaintiffs. On May 26, 2026, recent storm damage temporarily grounded a section of the fence, creating a brief gap in containment through which Macchi escaped. Geoffrey Pradia immediately became aware of the escape, located Macchi, and returned her to the secured property in less than five minutes. At no point did Macchi pose a threat to any person or animal. Geoffrey Pradia promptly addressed the storm-damaged section to prevent recurrence.

44. The combination of Chief Carter's own prior cooperative assistance with the fence, the documented professional repair by Anjel Mendez on February 23, 2026, the three months of successful containment between February 23 and May 26, the storm-caused nature of the failure, the recovery of the animal in less than five minutes, and the absence of any public safety impact collectively establish that the May 26, 2026 citation was not issued in response to any genuine or sustained ordinance violation, but was a pretextual enforcement action carried out pursuant to Mayor Newsom's preexisting directive, renewed upon the occurrence of a de minimis and involuntary incident. Geoffrey Pradia resolved the citation in municipal court by a plea of no contest, which was entered on May 26, 2026, before the events of May 29, 2026. Plaintiffs plead the facts concerning the citation as evidence of the City's motive, of its departure from its ordinary enforcement practices, and of the pattern of retaliation alleged in this Complaint. Plaintiffs do not, by this action, seek to set aside the municipal-court disposition of the citation or to recover damages for the citation or its resolution.

45. As Geoffrey Pradia exited the residence, neighbor Holdridge stood on the east side of her property directing vulgar and profane language toward the Pradia family's minor children, who were on their own property, specifically stating: "I've told them about those

goddamn fucking dogs." Lieutenant Spencer Brewer arrived with emergency lights activated and yelled toward Holdridge and toward Kassi Pradia, directing Kassi to "go back inside."

46. At approximately 12:05 p.m., Lieutenant Spencer Brewer issued Geoffrey Pradia a citation for dog-at-large and a written warning regarding vaccination records. When Geoffrey Pradia requested that a disorderly conduct citation be issued to Holdridge for directing profane language toward his minor children on their own property, Lieutenant Spencer Brewer refused. When Geoffrey Pradia later asked Chief Carter whether he could file a complaint about Holdridge's conduct, Chief Carter refused, stating Geoffrey Pradia "cannot be offended" as a police officer. When Geoffrey Pradia clarified that his wife and minor children were private citizens with the right to file a complaint, Chief Carter still refused.

47. The citation issued to Geoffrey Pradia was directed "per the Chief and the Mayor," as stated by Lieutenant Spencer Brewer. Chief Carter subsequently confirmed to Geoffrey Pradia that the citation was issued "per the mayor."

48. The enforcement against Plaintiffs was selectively applied. Multiple dogs routinely roamed the streets of Garrett without citation, including a black bully dog that regularly agitated Plaintiffs' dogs from the roadway and alley behind the property, and a white Great Pyrenees that roamed freely for over a year and a half without any enforcement action being taken. In addition, on a date to be determined through discovery, Josie Holdridge herself posted a video to Facebook documenting a stray dog on her own property. Holdridge took no adverse action regarding the stray, made no complaint to the City or the Garrett Police Department, and faced no enforcement action whatsoever. The existence of that video — in which the very person whose complaints triggered enforcement action against Plaintiffs publicly documented a stray

dog on her own property without consequence — is direct evidence of the selective and retaliatory character of the enforcement directed at Plaintiffs.

49. A review of prior City enforcement records, including an October 2024 incident on Beverly Drive involving multiple calls for service and citations, reflects no request for vaccination records despite Chief Carter's representation that records were always requested following dog incidents. In fact, prior to Josie Holdridge raising the issue of the Pradia family's dogs' vaccination status with Public Works Director Don Lewis — in direct retaliation for Geoffrey Pradia serving Holdridge with a notice to relocate a gas meter that was on Plaintiffs' property — the City had never demanded vaccination records from Geoffrey Pradia in connection with any animal ordinance matter. The City's sudden and unprecedented demand for vaccination records, first raised on May 12, 2026, was not the product of any routine or uniformly applied enforcement practice, but was a targeted measure introduced at Holdridge's instigation and directed exclusively at Plaintiffs.

50. On June 22, 2026 — three days before the closure of Internal Affairs Investigation IA-26-00004 and four days before Geoffrey Pradia's return to duty — the Garrett Police Department published a post to the "Garrett Talk" Facebook community group under Chief Carter's control, publicly announcing the City's rabies vaccination enforcement policy. The post states in relevant part: "WE DO NOT CONDUCT DOOR-TO-DOOR CHECKS. However, if we come into contact with your dog or cat due to a complaint, bite incident, dog-at-large complaint, or other issue, you may be asked to provide proof of vaccination." This post is the Garrett Police Department's own public statement of its actual vaccination enforcement policy, and it is directly and materially inconsistent with the enforcement actions taken against Geoffrey Pradia beginning May 12, 2026. Under the Department's own published policy,

vaccination records are requested only when officers come into contact with a dog or cat as a result of a qualifying triggering event — a complaint, a bite incident, or a dog-at-large complaint. The policy does not authorize proactive, targeted demands for vaccination records directed at specific residents in the absence of a qualifying triggering event.

51. Yet Chief Carter demanded vaccination records from Geoffrey Pradia on May 12, 2026 — not as a result of any qualifying triggering event on that date, but as a preemptive directive traceable to Holdridge's complaint to Public Works Director Don Lewis following Geoffrey Pradia's service of the gas meter notice. That demand was not authorized by the Department's own published enforcement policy and was not applied to any other Garrett resident. The June 22, 2026 post also references a City of Garrett Ordinance requiring vaccination records to be provided to the Garrett Police Department for pet registration purposes. Plaintiffs note that if no such pet registration system was uniformly administered prior to Holdridge's complaint to Don Lewis in May 2026, the post's reference to registration requirements constitutes further evidence that the enforcement framework was being constructed around the Pradia family rather than uniformly applied to all Garrett residents.

52. The timing of the post — published during Geoffrey Pradia's administrative leave three days before the IA closure, and four days before his return to duty — is also relevant: the Department's decision to publish a community-wide vaccination enforcement notice during the pendency of the investigation and administrative leave may reflect an attempt to retroactively legitimize a targeted enforcement action by framing it as part of a uniform community policy, which is itself evidence of consciousness of the pretextual nature of the original enforcement against Plaintiffs. Furthermore, the May 26, 2026 dog-at-large incident that served as the basis for the citation was de minimis in character. Macchi is a Great Pyrenees-Anatolian Shepherd mix

— a livestock guardian breed not known for aggression toward humans or other animals. The breed's characteristic behavior includes barking at other dogs and potentially chasing them as an expression of territorial and protective instinct, not as an expression of aggression or intent to harm.

53. Defendants have not produced evidence that Macchi was growling, biting, or posing any threat to any person or animal; the characterization of the incident as an "attack" is inconsistent with the breed's known characteristics and with the absence of any documented injury to any person or animal. Macchi escaped through a section of electric fence rendered temporarily inoperable by storm damage beyond Plaintiffs' control, was at large for less than five minutes, posed no genuine threat to any person or animal, and was recovered immediately upon Geoffrey Pradia becoming aware of the escape. The citation was issued not because of any genuine public safety concern but pursuant to a preexisting mayoral directive dating to on or about February 19, 2026, renewed by Mayor Newsom upon the May 26 incident, and executed by Lieutenant Brewer at the direction of Chief Carter and the Mayor.

54. Beginning in July 2026, the City of Garrett began harassing Plaintiffs about the height of the grass on their property at 401 W. Wyatt Street. The City did so although, upon information and belief, other properties in Garrett were not in compliance with landscaping requirements and were not the subject of enforcement; although City officials knew of the hardship the City's conduct had already caused Plaintiffs; and although City officials knew that Plaintiffs were not staying at the property because they did not feel safe living in Garrett. Plaintiffs allege that the height of the grass, compared with other properties, is immaterial. Regardless of the condition of the property, this was targeted enforcement that was not applied to

other Garrett residents, and it was a continuation of the harassment and the selective, retaliatory enforcement described above.

### E. Warrantless Entry, Unlawful Seizure of Kassi Pradia, and Coercive Interview of Minor Children (May 29, 2026)

55. On the afternoon of May 29, 2026, Kassi Pradia was inside the gated property at 401 W. Wyatt Street attending to the dogs. Dewart and her husband Steurer arrived at the property at approximately 3:50 p.m., purportedly to assist with fence repairs. A.H., the Pradia family's oldest child (identified by initials pursuant to Fed. R. Civ. P. 5.2(a)(3)), went outside to greet Dewart. As Kassi Pradia walked toward the gate to investigate the arrival of two marked Ellis County Sheriff's Office vehicles, she observed her daughter A.H. crying and shaking, rushing toward her.

56. Before A.H. could reach her mother, Corporal Jacob Houston called out directing the child to return. Kassi Pradia immediately asserted: "She's a minor. You don't have a right to talk to my minor child. I am her mother." Corporal Jacob Houston responded: "Yes I do."

57. Corporal Jacob Houston then physically seized Kassi Pradia: he placed his hands on her, forcibly removed her from her own property through the gate, handed her to Deputy Tracy Hightower, and threatened to arrest her if she did not comply. Kassi Pradia had committed no crime, was not under arrest, and was given no lawful basis for her removal. She was not free to leave. This was an unlawful seizure under the Fourth Amendment. At the time of this seizure, Kassi Pradia was the breastfeeding mother of a thirteen-month-old infant who was inside the home. The unlawful seizure of a nursing mother carries heightened severity for several distinct reasons. First, the forced separation of a breastfeeding mother from her nursing infant causes immediate and foreseeable physical discomfort to the mother and urgent distress to the child — both direct consequences of the unlawful seizure for which Defendants are responsible.

58. Second, Kassi Pradia's inability to attend to her infant during her unlawful confinement in the street outside her own property — while simultaneously being compelled to watch law enforcement officers enter her gated property without consent and interview her older children without parental authorization — compounded the psychological trauma and emotional distress she suffered as a result of the encounter in ways that would not have applied to a person without an infant in the home. Third, the physical nature of the seizure itself — being grabbed and forcibly moved by a law enforcement officer — poses concerns of heightened severity for a nursing mother. The forced separation from her nursing infant without any lawful basis, and the physical seizure of a breastfeeding mother by law enforcement officers who had no lawful authority to detain her, constitute aggravating elements of both the physical harm and the emotional distress damages arising from the May 29, 2026 seizure, and further implicate the substantive due process family integrity rights alleged in Count VIII.

59. After physically removing Kassi Pradia from the property, Corporal Jacob Houston passed through the closed, gated curtilage of the Pradia family's residence without a warrant, without consent — Kassi Pradia having explicitly objected to officers being on the property — and without any exigent circumstances. He then proceeded to interview the Pradia minor children inside the property. Dewart and Steurer were the only adults present during this interview. Dewart was the very individual who had spent weeks psychologically manipulating and coaching these children. No parental authorization was given for Dewart or Steurer to serve in a parental or supervisory role during the children's interview with law enforcement. In a further violation of Fourth Amendment principles, after Kassi Pradia had explicitly refused consent for deputies to be on the property, Corporal Houston approached A.H., the Pradia family's fourteen-year-old daughter, and asked her to open the door to the residence and allow

deputies to look inside. This request was made directly to a minor child after the adult homeowner had explicitly withheld consent.

60. At approximately 3:57 p.m., Kassi Pradia called Geoffrey Pradia, who was on duty in full uniform. He arrived within minutes to find his wife standing in the street under the supervision of Deputy Tracy Hightower. Deputy Tracy Hightower stated he did not know why he was there and that he was "just backup."

61. Geoffrey Pradia immediately informed the deputies that the family was represented by an attorney, cited Texas law prohibiting interviews of minor children without parental consent absent a court order or exigent circumstances, and placed the attorney on the phone with Deputy Tracy Hightower. Deputy Tracy Hightower spoke with the attorney but refused to intervene, refused to contact Corporal Jacob Houston to stop the unlawful interview, and repeatedly stated that he did not know why he was there or what was occurring.

62. During the May 29, 2026 encounter, Deputy Tracy Hightower separately asked both Geoffrey Pradia and Kassi Pradia whether they believed that Josie Holdridge's conduct toward them — including her complaints, her harassment campaign, and her social media statements — was motivated in any way by race or ethnicity. Deputy Hightower posed this question to Geoffrey Pradia and to Kassi Pradia individually. This inquiry by Deputy Hightower is significant for several reasons. First, it demonstrates that a law enforcement officer present at the scene on May 29, 2026 independently perceived a possible racial or ethnic dimension to the conflict between the Pradia family and Holdridge — a perception that arose not from Plaintiffs' own characterization of the dispute but from Hightower's own observation of the circumstances. Second, it places on the record, from the mouth of a named defendant, an acknowledgment that race and ethnicity were potentially relevant factors in the events giving rise to this Complaint.

63. Third, it is relevant to the Equal Protection analysis: the Pradia family is an interracial household — Geoffrey Pradia is Black and Kassi Pradia is White and Native American — and Deputy Hightower's question reflects a contemporaneous law enforcement assessment that the racial composition of the family may have been a motivating factor in Holdridge's conduct and, by extension, in the conduct of City officials who acted upon Holdridge's complaints. Plaintiffs' responses to Deputy Hightower's inquiry, and all records of that inquiry and any documentation thereof by the Ellis County Sheriff's Office, are subject to discovery and are expected to be relevant to the race and ethnicity-based claims reserved herein.

64. When Corporal Jacob Houston emerged from the property, he continued attempting to gather identifying and contact information from Kassi Pradia. When Geoffrey Pradia attempted to ask questions about what was occurring, Corporal Jacob Houston threatened to arrest him if he did not walk away. Geoffrey Pradia, to avoid escalation, withdrew and voluntarily disarmed himself, handing his duty belt to Deputy Tracy Hightower. Geoffrey Pradia was thereby barred from his own property and from his minor children by armed officers who threatened him with arrest if he did not comply. He was not free to enter his home or to exercise his parental and property rights, and under the totality of the circumstances the restraint was tantamount to arrest.

65. Corporal Jacob Houston subsequently acknowledged to the Pradia family that he had observed no signs of abuse. Despite this admission, he called the Texas Department of Family and Protective Services ("DFPS") and designated the complaint "priority 1."

66. Chief Carter arrived on scene at approximately 4:00 p.m., driving a personally owned, unmarked vehicle and not in uniform, and informed Geoffrey Pradia that the investigation was triggered by a report from neighbor Holdridge — the same neighbor who had a

documented history of hostility toward the Pradia family, had cursed at their children days earlier, and whose complaints Chief Carter had consistently acted upon while refusing to take any complaint from the Pradia family. The report alleged the children were being "beaten naked" and "made to stand on the wall naked for hours." Chief Carter, who had actual knowledge of: (a) Holdridge's longstanding retaliatory conduct toward the Pradia family; (b) Holdridge's prior social media statement threatening to report child abuse; (c) Mayor Newsom's awareness of that threat; (d) the documented conflict between Holdridge and the Pradia family; and (e) Holdridge's use of her City Council position to target the Pradia family — accepted Holdridge's report at face value and, upon information and belief, passed the matter to the Ellis County Sheriff's Office without disclosing any of this exculpatory context. By doing so, Chief Carter caused the Sheriff's Office to respond to and escalate an investigation it would not otherwise have undertaken, or would have undertaken with far greater scrutiny, had it been provided the full picture of Holdridge's documented retaliatory history and prior threats.

67. Plaintiffs were eventually permitted to see their children, but only under police escort. Their children were crying, terrified, and clinging to them. No court order authorizing the entry, the seizure of Kassi Pradia, or the interview of the children was ever produced or existed. Until that time, and throughout the interview of the children, Geoffrey Pradia was denied access to his own property and children, and was allowed to see them only on the officers' terms. Without a warrant, without exigent circumstances, and without any lawful justification, deputies held Kassi Pradia and Geoffrey Pradia, separated from their children, for well over an hour. For approximately the first forty-five minutes, the deputies refused to tell either Plaintiff the nature of the allegations or why they were there; Plaintiffs did not learn the reason for any of the deputies' actions until about forty-five minutes into the encounter. By then, the deputies had

already entered the property, interviewed the children without parental consent, and seized and detained Kassi Pradia in a manner tantamount to arrest. Withholding the purpose of their actions from the parents until after those acts had been carried out underscores how extreme the circumstances were.

68. Critically, none of the Pradia children made any outcry of abuse to law enforcement during the May 29, 2026 encounter. Corporal Jacob Houston himself acknowledged observing no signs of abuse. The investigation was not initiated by any statement, disclosure, or outcry made by the children to police, but was driven entirely by a coached complaint originating from neighbor Holdridge — a person with a documented retaliatory history — transmitted through children who had been subjected to weeks of deliberate psychological manipulation by Dewart, who was physically present during the children's interview with law enforcement. Furthermore, Texas law recognizes a parent's right and duty to exercise reasonable discipline of the parent's child. See Tex. Fam. Code § 151.001(a)(2). Even had Plaintiffs engaged in any corporal discipline — which they had not in the three weeks preceding the complaint — the investigation, warrantless entry, physical seizure of Kassi Pradia, and escalation to a criminal matter would have been directed at a legally protected parenting practice. The absence of any injury, any outcry, any court order, and any credible corroborating evidence, combined with law enforcement's actual knowledge of the complainant's retaliatory history, rendered the investigation constitutionally unjustifiable from its inception.

69. The events of May 29, 2026 caused significant and distinct trauma to the Pradia children beyond any pre-existing distress from Dewart's manipulation. The children witnessed their mother physically seized by law enforcement and forcibly removed from her own property. They were interviewed without either parent present, with Dewart — the very individual who

had spent weeks coaching and threatening them — as the only adult in the home during the encounter. Deputies attempted to persuade the oldest child to enter a patrol vehicle and leave the property without parental consent. When Kassi Pradia attempted to intervene to protect her children, she was physically removed by officers in the children's presence. The children were separated from both parents and subjected to police questioning under circumstances calculated to frighten and disorient them. When reunited with their parents, the children were crying, visibly terrified, and clinging to them. These traumatic experiences — caused directly by Defendants' unconstitutional conduct — compounded the psychological harm the children had already suffered from Dewart's manipulation and constitute a distinct and cognizable element of the damages suffered by the Pradia family.

70. Upon information and belief, no exigent circumstances existed to justify the warrantless entry. The allegations relayed by Holdridge arose from statements allegedly made by children who had been subjected to weeks of psychological manipulation by Dewart, who was present on the scene and in the property during the children's interview. Plaintiffs' children had not been subjected to any corporal discipline in the three weeks preceding the complaint.

### F. Retaliatory Administrative Leave (May 29, 2026 — Evening)

71. On May 7, 2026, Geoffrey Pradia contacted Lieutenant Spencer Brewer and Chief Carter to report that he was ill and unable to work his shift. Lieutenant Brewer directed Geoffrey Pradia to take the matter up with Chief Carter. Chief Carter's immediate response was not to address Geoffrey Pradia's illness or arrange shift coverage, but to state words to the effect of: "you know technically you aren't supposed to work any off duty after you call in sick until you've worked a full shift at the PD." This statement — delivered as the first and primary response to a routine sick day notification — established a pattern of Chief Carter using off-duty

employment restriction as a lever of economic control over Geoffrey Pradia, a pattern that would recur on May 29, 2026.

72. At approximately 9:00 p.m. on May 29, 2026, Chief Carter telephoned Geoffrey Pradia and directed him to come to the Garrett Police Department to meet with DFPS investigators Brian Tabor and a partner. Upon information and belief, Chief Carter was not ordinarily present at the department at that hour. The investigators were already present when Geoffrey Pradia arrived, and Chief Carter was there with them. Chief Carter had arrived at the Pradia home earlier that afternoon in a personally owned, unmarked vehicle and out of uniform; at the station that evening, by contrast, he was driving a personally owned vehicle bearing Limestone County constable identification and was wearing a Limestone County constable shirt. Upon information and belief, Chief Carter was thereby presenting himself in a Limestone County law-enforcement capacity, not as the Garrett Chief of Police, while handling an outside-agency (DFPS) matter concerning Plaintiffs in Garrett, Ellis County, where he had no authority to act in that capacity. On either footing, Chief Carter acted under color of state law and used the apparent authority of his office. Geoffrey Pradia informed the investigators that the family was represented by an attorney and that all contact with the children must be directed through counsel. Tabor asked to "lay eyes" on the children, and Geoffrey Pradia, a subordinate officer standing in the police station before his own Chief of Police and believing that his employment was at stake, felt he had no choice but to comply, and called Kassi Pradia and had her load the children and bring them to the station for visual confirmation only. While Geoffrey Pradia waited for Kassi Pradia to arrive, Chief Carter engaged him in conversation about his pending application to the San Saba County Sheriff's Office and his need for a copy of his high school diploma from his personnel file. That collegial exchange, which touched on Geoffrey Pradia's

career plans and intended departure from the department, took place after Geoffrey Pradia had spoken with the investigators and invoked his right to counsel. Kassi Pradia then arrived with the children, the visual confirmation occurred, and the investigators departed. Chief Carter did not inform Geoffrey Pradia of any administrative leave until after he had heard Geoffrey Pradia invoke his right to counsel to the investigators. By ordering Geoffrey Pradia to the station at night and keeping him there in the presence of the investigators and his own Chief, Chief Carter used his official authority over Geoffrey Pradia's employment to create a situation tantamount to an arrest, in which Geoffrey Pradia reasonably believed he was not free to leave or to refuse, and in which he was compelled to comply with the demands of an outside agency, including summoning his wife and children to the station. Chief Carter thereby personally and directly participated in the DFPS/CPS investigation of May 29, 2026, in addition to the criminal and Internal Affairs matters. He blended all three proceedings into one, and used his command authority over a subordinate officer to produce a seizure and forced compliance with outside agencies, effectively negating the rights Plaintiffs would otherwise have been able to assert. These facts show the seriousness of Chief Carter's personal involvement, which went well beyond that of a bystander.

73. On the evening of May 29, 2026, at approximately 9:30 p.m., immediately after the DFPS investigators departed, and directly after hearing Geoffrey Pradia invoke his right to counsel to those investigators, Chief Carter met with Geoffrey Pradia at the Garrett Police Department and verbally advised him that he was being placed on Administrative Leave With Pay, citing the pending criminal investigation, CPS investigation, and Internal Affairs Investigation IA-26-00004. Among the first statements Chief Carter made in announcing the leave was: "so you are going to be on paid administrative leave. That means no off duty work."

This announcement was made within minutes of Geoffrey Pradia's invocation of his right to counsel. Chief Carter was also aware at this time that Geoffrey Pradia had recently applied for employment with another law enforcement agency. The Internal Affairs allegation of "lack of truthfulness and non-cooperation with investigations" was not put in writing or communicated to Geoffrey Pradia until June 3, 2026. Upon information and belief, however, it formed part of the basis for the leave that Chief Carter communicated verbally on May 29, 2026, minutes after Geoffrey Pradia asserted his right to counsel in the Chief's presence. Chief Carter had ample time to prepare the Internal Affairs paperwork and present it to Geoffrey Pradia on May 29, 2026, but did not do so. Plaintiffs allege, upon information and belief, that he did not do so because he was already engaged in investigative activity and was already merging the criminal, CPS, and Internal Affairs investigations.

74. The formal written Notice of Administrative Leave With Pay was not presented to Geoffrey Pradia for signature until June 3, 2026 — the same date as the coercive administrative meeting described below — meaning that the formal paperwork documenting the administrative leave was presented to Geoffrey Pradia at the very meeting at which he was simultaneously subjected to criminal questioning by Ellis County Sheriff's Office investigators. This timing is directly relevant to the Garrity claim: Geoffrey Pradia was presented with formal written documentation of his administrative leave — a document he was required to sign acknowledging receipt — at the same meeting at which investigators were conducting a concurrent criminal interview, creating a coercive structure in which the administrative consequences of his employment status were made formally concrete at the precise moment he was being questioned about matters that could expose him to criminal liability.

75. The written Notice of Administrative Leave With Pay contained the following directives, each of which is relevant to Plaintiffs' claims: Directive 4 expressly prohibited Geoffrey Pradia from engaging in any off-duty employment requiring a peace officer commission, police authority, law enforcement authority, or security authority derived from his peace officer status — confirming in writing the off-duty employment restriction Chief Carter had verbally announced on May 29, 2026, and eliminating Geoffrey Pradia's income from Point Blank Safety. Directive 8 required Geoffrey Pradia to remain available during normal duty hours to respond to communications or directives from the Chief of Police — meaning Geoffrey Pradia was simultaneously barred from off-duty work that required his peace officer authority, restricted in non-law enforcement related off-duty employment by the requirement that he remain available during normal duty hours, and required to remain available as though he were on active duty.

76. While the administrative leave was designated as paid — and the written notice correctly reflects Administrative Leave With Pay — the City of Garrett separately failed to timely disburse those wages for a substantial period, as described more fully below. The notation in the written administrative leave document that omitted the word "With" before "Pay" was a clerical error in Chief Carter's drafting and does not reflect the actual designated status of the leave, which was at all times paid administrative leave. Directive 12 imposed a confidentiality requirement, stating that all matters related to the leave and pending review were confidential — a directive that, to the extent it was intended or had the effect of preventing Geoffrey Pradia from discussing the circumstances of his leave with others, may constitute an unconstitutional restriction on protected speech and is relevant to the First Amendment retaliation claims. The administrative leave notice expressly stated that it was non-disciplinary in nature and should not be construed as a determination of guilt, misconduct, or policy violation.

77. It also stated that the leave would remain in effect until further notice and may be modified or rescinded at the discretion of the Mayor or Chief of Police — expressly reserving to Mayor Newsom the authority to determine when Geoffrey Pradia's leave would end.

78. The administrative leave was expressly imposed in connection with Internal Affairs Investigation IA-26-00004, and the Internal Affairs paperwork cited, as a basis for that investigation, an allegation of lack of "truthfulness and cooperation during investigations." That allegation rested on Geoffrey Pradia's assertion of his legal right to counsel during the criminal and CPS investigations. Plaintiffs allege that the leave and the Internal Affairs investigation were imposed because Geoffrey Pradia asserted his right to counsel, as further described in Part III.I below.

79. The investigation underlying Geoffrey Pradia's administrative leave was maintained for an unreasonable period of time that is now definitively established by the documentary record. The May 29, 2026 referral originated as a welfare check based on a coached complaint from a neighbor with a documented retaliatory history. No Pradia child made any outcry of abuse to law enforcement on May 29, 2026. The responding deputy observed no signs of abuse. DFPS investigators assessed the children visually at the police station the same evening and departed without taking any protective action. On June 25, 2026, Chief Carter issued a formal memorandum closing Internal Affairs Investigation IA-26-00004 and terminating Geoffrey Pradia's administrative leave effective immediately, directing him to return to duty on June 26, 2026. The closure memorandum states expressly that the Ellis County Sheriff's Office has advised that its criminal investigation has been suspended due to insufficient evidence to proceed at this time, and that there is no further basis to continue the department's internal administrative investigation.

80. This documented governmental acknowledgment is dispositive: the criminal investigation that served as the stated basis for Geoffrey Pradia's administrative leave — and for IA-26-00004, the off-duty employment restriction, the storage unit search, the coercive June 3 interview, the wage withholding, the contact with Point Blank Safety, and every other adverse action described in this Complaint — has been suspended for insufficient evidence. The entire twenty-seven day period of administrative leave, economic coercion, constitutional violations, and financial hardship imposed upon a sole provider household with four minor children, including an infant who was then thirteen months old and nursing rested upon an evidentiary foundation that law enforcement itself has now acknowledged did not exist. The deliberate maintenance of that investigation for twenty-seven days functions not as a legitimate law enforcement measure but as a documented financial coercion strategy — an attempt to exhaust Plaintiffs' financial resources and force Geoffrey Pradia into submission through economic attrition rather than through any legitimate investigative or disciplinary process.

81. This strategy is sometimes called "running out the clock" on a subject's financial stability, and it succeeded in causing concrete harm: Plaintiffs were compelled to pawn personal property, fell behind on financial obligations, suffered damage to their credit repair efforts, and Kassi Pradia and Geoffrey Pradia were each forced to withdraw from their degree programs at Thomas Edison State University — all as a direct and proximate result of an investigation that has now been suspended for insufficient evidence. The IA closure memorandum also contains a reservation clause stating that nothing in the memorandum limits the City's authority to investigate or take appropriate administrative action should additional information become available in the future. This reservation clause constitutes a continuing threat of future adverse action and is relevant to the ongoing nature of the constitutional violations described herein.

Plaintiffs reserve the right to seek relief for each day of unconstitutional conduct and expressly note that the reservation clause preserves the potential for future violations for which Defendants may similarly be held liable.

82. On June 10, 2026 — while Geoffrey Pradia remained on administrative leave — Chief Carter issued a department-wide memorandum to all full-time Garrett Police Department officers titled "Shift Readiness, Vehicle Inspections, Uniform Standards, and Productivity Expectations." While facially general in scope, the memorandum contains provisions that, in context, are directly relevant to Plaintiffs' retaliation claims. First, the memorandum imposes a department-wide prohibition on smoking in public view while representing the Garrett Police Department. Geoffrey Pradia has been a smoker throughout his employment with the Garrett Police Department. The imposition of this specific prohibition, issued during Geoffrey Pradia's administrative leave and shortly before his anticipated return to duty, targets a known personal characteristic of his. Second, the memorandum imposes new productivity expectations, including monthly evaluations of "officer productivity, activity levels, self-initiated enforcement, report writing, and overall performance," and directs that officers are not to remain at the police department significantly before the end of their shift absent a legitimate law enforcement or administrative need.

83. These provisions are facially inconsistent with Geoffrey Pradia's actual performance record: Geoffrey Pradia has been documented as the most productive officer in the Garrett Police Department for each of the preceding twenty-four months. A memorandum emphasizing productivity deficiencies and excessive time spent at the police department cannot plausibly have been directed at correcting any performance deficiency on Geoffrey Pradia's part, as no such deficiency existed or could be documented. The issuance of this memorandum during

Geoffrey Pradia's administrative leave, containing provisions specifically relevant to his personal habits and his actual job performance record, is consistent with the pattern of pretextual policy enforcement already alleged in this Complaint with respect to the animal ordinance vaccination requirements, and supports the inference that the memorandum was crafted, at least in part, in anticipation of and in connection with continued retaliatory conduct directed at Geoffrey Pradia upon his return to duty.

84. During Geoffrey Pradia's administrative leave — around the time his wages were being withheld — Chief Carter offered Geoffrey Pradia's position to a volunteer officer, Baldemar Sanchez. Geoffrey Pradia learned of this directly from Sanchez himself, who personally informed Geoffrey Pradia that Chief Carter had offered him Geoffrey Pradia's position. This fact is dispositive of Defendants' intent with respect to Geoffrey Pradia's continued employment. An employer who intends for an employee to return from administrative leave does not simultaneously offer that employee's position to another individual, let alone a volunteer officer serving without the compensation, training investment, or institutional commitment associated with a paid sworn position.

85. Chief Carter's decision to offer Geoffrey Pradia's position to a volunteer officer during the same period in which Geoffrey Pradia's pay was being withheld demonstrates that Chief Carter did not intend for Geoffrey Pradia to return to active duty, and that the administrative leave, the prolonged investigation, the withheld wages, and the elimination of off-duty income were components of a deliberate strategy to remove Geoffrey Pradia from his position entirely — whether through formal termination following a contrived disciplinary outcome, or through constructive discharge resulting from the cumulative weight of Defendants' conduct. This fact, made known to Geoffrey Pradia only after the events described herein, is

directly relevant to Plaintiffs' First Amendment retaliation claim, to the Monell claim against the City of Garrett insofar as it reflects a deliberate decision by Chief Carter as final policymaker, and to the constructive discharge described in the paragraphs that follow.

86. On June 26, 2026 — the same day he was directed to return to duty following the closure of IA-26-00004 — Geoffrey Pradia submitted his formal resignation from the Garrett Police Department, effective immediately, citing the retaliatory and discriminatory actions of the Garrett Police Department and City administration following the events of May 29, 2026, which he stated had created a hostile working environment necessitating his immediate separation from employment.

87. Geoffrey Pradia's resignation constitutes a constructive discharge under settled federal employment law: a reasonable person in Geoffrey Pradia's position, having endured a twenty-seven day administrative leave premised on an investigation later suspended for insufficient evidence, the withholding of wages, the elimination of off-duty employment income through direct contact with his employer, a coercive interview structure implicating his Fifth and Sixth Amendment rights, a search of his property based on mischaracterized evidence, the publication of a department-wide policy memorandum targeting his personal habits and contradicting his documented performance record, and the discovery that his own position had been offered to a volunteer officer during his leave, would have felt compelled to resign rather than continue subjecting himself and his family to that course of conduct.

88. Geoffrey Pradia's resignation letter expressly demanded payment of all accrued compensation and benefits, including accrued vacation time, sick days, and holiday compensation pay; requested expedited processing of his separation documentation; formally requested that any future internal affairs inquiries or employment-related communications be

limited to the "four corners" of official documentation, given the closure of IA-26-00004 for insufficient evidence; and expressly reserved all rights and remedies, including legal action, should Defendants make any false, misleading, defamatory, or retaliatory statement that adversely affects Geoffrey Pradia's ability to obtain future law enforcement employment. Geoffrey Pradia's constructive discharge constitutes a distinct and independently compensable harm, separate from and in addition to the discrete acts of retaliation described elsewhere in this Complaint, and represents the culmination of the retaliatory campaign against Plaintiffs that began no later than February 19, 2026.

89. As a direct and proximate result of the constructive discharge, Geoffrey Pradia has lost his career with the Garrett Police Department, the accrued seniority, benefits, and professional standing associated with that position, and his ability to pursue alternative law enforcement employment without the cloud of a retaliatory internal affairs history — damages that are ongoing and that Plaintiffs will further quantify through discovery and expert testimony regarding lost future earnings. Since leaving the Garrett Police Department, Geoffrey Pradia has been denied employment by, or has received no response from, every law enforcement agency to which he has applied since May 29, 2026, as described in Part III.J below.

90. Following Geoffrey Pradia's return to duty and immediately preceding his resignation on June 26, 2026, Josie Holdridge came to the Garrett Police Department and engaged in conduct directed at Geoffrey Pradia that he reasonably perceived as an attempt at intimidation. This encounter was independently witnessed by a court clerk present at the Garrett Police Department at the time, providing a credible, disinterested witness to Holdridge's conduct. This contact by Holdridge — occurring at the very institution where the retaliatory campaign against Plaintiffs was carried out, and immediately preceding Geoffrey Pradia's

constructive discharge — is consistent with the pattern of harassment and intimidation that Holdridge has directed at Plaintiffs throughout the events described in this Complaint, and further corroborates Holdridge's ongoing animus toward Plaintiffs, her continued willingness to leverage her relationships with City officials and her physical presence at City facilities to harass and intimidate Plaintiffs, and the direct connection between her conduct and the final events leading to Geoffrey Pradia's resignation. Plaintiffs will identify the court clerk witness and seek her account of the encounter through discovery.

91. The timing and circumstances of the administrative leave — imposed directly after Geoffrey Pradia asserted his constitutional rights before investigators — establishes a retaliatory motive. Chief Carter's use of off-duty employment restriction as an economic lever, demonstrated first on May 7, 2026 when he responded to a sick day call by immediately restricting off-duty work, and repeated as one of his first statements when announcing the administrative leave on May 29, 2026, evidences a deliberate and sustained pattern of economic coercion targeting Geoffrey Pradia's financial livelihood. Chief Carter knew Geoffrey Pradia relied on off-duty employment to meet his financial obligations, making this a calculated pressure point. The contrast with Chief Carter's handling of an earlier DFPS investigation confirms that placing Geoffrey Pradia on leave was not standard practice. In June 2025, DFPS investigated allegations against Plaintiffs that were, if anything, more serious than those at issue here. No Internal Affairs investigation was opened, Geoffrey Pradia was not placed on administrative leave, and Chief Carter stayed out of the matter. As in 2026, Plaintiffs were represented by an attorney and dealt with DFPS through counsel, and DFPS closed that investigation within days of opening it because it had no factual basis. Had placing an officer on administrative leave during a CPS investigation been the Department's standard procedure,

Geoffrey Pradia would have been placed on leave in 2025. Working through counsel drew no adverse employment action in 2025; in 2026, Chief Carter treated the same assertion of counsel, made in his presence, as "non-cooperation."

### G. Coercive Interview and Blending of Criminal and Administrative Investigations (June 3, 2026)

92. On June 3, 2026, Geoffrey Pradia and Kassi Pradia drove to the Garrett Police Department together, in the same vehicle, arriving at approximately 10:15 a.m. Chief Carter had told Geoffrey Pradia by telephone that the purpose of the meeting was for Geoffrey Pradia to sign Internal Affairs paperwork. Upon arrival, however, Ellis County Sheriff's Office Investigators Michael Potempa and Sergeant Joseph Fitzgerald were already present, and Chief Carter directed Geoffrey Pradia to speak with them first, before handing him the Internal Affairs paperwork that the meeting had supposedly been called to address. Plaintiffs allege that this was a coordinated ambush interview, planned by Chief Carter in cooperation with the Ellis County investigators, in which Chief Carter used Geoffrey Pradia's employment as leverage to force him to cooperate with an outside criminal investigation, and which created a situation tantamount to arrest. Lieutenant Spencer Brewer was also present at the Garrett Police Department during the June 3 encounter and participated in the administrative meeting with Chief Carter. Brewer's presence on June 3 is significant: he was the same officer who had directed the retaliatory citation on May 26, 2026 at the Mayor's instruction, who had refused to take a complaint from Plaintiffs regarding Holdridge's profane language toward their children, and who was aware of Kassi Pradia's vulnerability, past trauma, and legal history. His participation in the June 3 meeting — alongside Chief Carter, who held the same awareness — placed two officers with actual prior knowledge of Kassi Pradia's vulnerability in direct roles within the coercive

structure that isolated her from her husband and subjected her to an involuntary interview outside the building.

93. Geoffrey Pradia immediately informed Investigators Potempa and Fitzgerald that he was represented by an attorney and that all communication must go through counsel. The investigators disregarded this invocation and continued questioning him regarding the children, the May 29 incident, the allegations, and forensic interviews. Geoffrey Pradia reasonably believed, given his concurrent status on administrative leave and the pending internal affairs allegation of "Truthfulness and cooperation during investigations," that he was not permitted to decline the interview or leave the location. Geoffrey Pradia was not free to leave: he had been directed by his Chief of Police to attend, he was on administrative leave, and he had arrived in the same vehicle as his wife.

94. This structure — directing an officer under an active internal affairs investigation containing a cooperation charge to submit to a simultaneous criminal interview — had the coercive effect of compelling Geoffrey Pradia to provide statements under threat of employment consequences.

95. During the subsequent administrative meeting, Chief Carter and Lieutenant Brewer together: (a) discussed the status of Plaintiffs' dogs' vaccination records and the outstanding written warning previously issued to Geoffrey Pradia requiring production of those records — a matter of independent legal significance, as that written warning created a formal compliance obligation enforceable through criminal or civil process, rendering Geoffrey Pradia simultaneously a subject of criminal investigation regarding his children, a respondent in an internal affairs proceeding, and a defendant-equivalent with respect to the pending animal ordinance enforcement matter; (b) disclosed that a search warrant had been executed on

Plaintiffs' storage unit as part of the criminal investigation; and (c) participated in directing Geoffrey Pradia to remain inside the Police Department building while investigators conducted an outside interview of Kassi Pradia — thereby preventing Geoffrey Pradia from informing Kassi Pradia that she did not have to participate in the interview, after he had already informed the investigators that it was not an appropriate time for them to attempt to speak with Kassi while they were interviewing him.

96. Lieutenant Brewer's active participation in directing or acquiescing in Geoffrey Pradia's confinement inside the building during Kassi Pradia's interview is particularly significant given that Brewer was aware of Kassi Pradia's vulnerability, past trauma, and legal history, and was present at the Garrett Police Department with actual knowledge of her vulnerability throughout the June 3 encounter. His participation in the structure that isolated Kassi from her husband — a structure that Carter and Brewer together maintained while investigators questioned her outside — constitutes direct personal involvement in the constitutional violations alleged in Count VI and Count X, and extends his individual liability beyond the May 29, 2026 events. The convergence of these three simultaneous legal exposures — criminal, administrative, and regulatory — during a single meeting orchestrated by Chief Carter and participated in by Lieutenant Brewer further demonstrates the coercive and retaliatory nature of the June 3 encounter and compounded the Garrity violation described above by ensuring Geoffrey Pradia faced potential adverse consequences across multiple legal contexts regardless of how he responded.

97. Kassi Pradia was approached by Investigators Potempa and Fitzgerald outside the Police Department while waiting in the vehicle in which she and Geoffrey Pradia had arrived together. The investigators did not clearly inform Kassi Pradia of what rights she possessed,

including whether she was free to decline the interview or to wait for her attorney, and they questioned her about the children, the May 29 incident, and the storage unit. When she stated "you know I have an attorney, right?", the investigators replied "yeah, we know," and continued questioning her. Geoffrey Pradia observed one of the investigators communicate toward the building before Chief Carter emerged, came outside, and instructed Geoffrey Pradia to come back inside, telling him words to the effect that "they want you inside until they are done talking to your wife." Lieutenant Brewer was present inside the Police Department during this period and participated in or acquiesced in maintaining Geoffrey Pradia's confinement inside the building for the duration of Kassi's interview. Because Plaintiffs had arrived together in a single vehicle, Kassi Pradia could not leave the premises without Geoffrey Pradia, and his detention inside the building therefore left her unable to leave.

98. Chief Carter and Lieutenant Brewer together ensured that Geoffrey Pradia remained physically separated from Kassi Pradia throughout the interview, preventing him from reaching her to inform her that she did not have to participate in the interview, as he had already told the investigators that it was not an appropriate time for them to attempt to speak with Kassi while they were interviewing him. Brewer's participation in maintaining this separation — with actual knowledge of Kassi Pradia's vulnerability, past trauma, and legal history — constitutes direct personal involvement in the constitutional violations that followed, including the involuntary seizure of Kassi Pradia described in paragraph 99 and the denial of right to counsel described in Count VI.

99. Although Investigators Potempa and Fitzgerald may have nominally indicated that Kassi Pradia could decline the interview, the totality of the circumstances rendered her participation involuntary and constituted a de facto seizure tantamount to arrest. Kassi Pradia

was approached while seated in her vehicle in the parking lot of a police station — an inherently coercive environment. She was not told she could wait for an attorney despite investigators' acknowledged awareness that she was represented. She observed her husband, who was not in uniform, begin to approach to assist her, only to be intercepted and physically directed back inside the building by the Chief of Police, who told him words to the effect that the investigators wanted Geoffrey inside until they were done with Kassi. The investigators' communication to Chief Carter that triggered this intervention was itself an act of coordination designed to isolate Kassi Pradia and prevent her from receiving assistance from her husband or asserting her right to counsel.

100. Chief Carter, who orchestrated Geoffrey Pradia's confinement inside the building during Kassi's interview, was aware of Kassi Pradia's vulnerability, past trauma, and legal history, and directed the isolation of Kassi Pradia with actual prior knowledge of that vulnerability and its implications for her perception of the encounter. A reasonable person in Kassi Pradia's circumstances — approached at a police station by investigators who acknowledged knowing she had an attorney yet continued questioning her, while watching her husband be physically redirected inside the building by the Chief of Police — would not have felt free to leave. The encounter therefore constituted a seizure under the Fourth Amendment for which no lawful basis existed. Moreover, because Kassi Pradia and Geoffrey Pradia had arrived together in the same vehicle and needed to leave together, Geoffrey Pradia's detention inside the building meant that Kassi Pradia could not leave.

101. The detention of Geoffrey Pradia inside the Garrett Police Department by Chief Carter and Lieutenant Brewer was likewise a seizure tantamount to arrest. Geoffrey Pradia, who was on administrative leave, who was subject to an Internal Affairs investigation containing an

allegation of lack of "truthfulness and cooperation," and who was not in uniform, was directed by the Chief of Police to come back inside and was told, in words to the effect, that the investigators wanted him inside until they were done talking to his wife. Given that context — the Chief's authority over his employment, the pending Internal Affairs investigation, and his reasonable belief that disobeying the directive would bring adverse employment consequences — a reasonable person in his position would not have felt free to leave, and no lawful basis existed for the restraint. The restraint was aggravated by the manner in which Geoffrey Pradia came to be there: he had been told that the June 3 meeting was to sign Internal Affairs paperwork, only to be confronted on arrival, before receiving that paperwork, with criminal investigators who were already waiting.

102. On June 24, 2026, Investigator Potempa left voicemails for both Geoffrey Pradia and Kassi Pradia at approximately 11:13 a.m., requesting that they contact him to schedule a forensic interview of the Pradia family's minor daughter. In those voicemails, Investigator Potempa acknowledged that he had been attempting to reach the Pradia family's attorney but had been unable to do so, and stated that he was therefore reaching out to the Pradia family directly. This acknowledgment is significant: Investigator Potempa affirmatively confirmed his awareness that the family is represented by counsel, confirmed he had been attempting to contact that attorney, and then — rather than continuing those efforts — deliberately bypassed counsel and contacted the represented parties directly. Geoffrey Pradia had explicitly informed Investigator Potempa on June 3, 2026 that all communication must be directed through the family's attorney. Inability to promptly reach an attorney does not excuse or justify direct contact with a represented party. These contacts constitute a continued and knowing violation of the Sixth

Amendment right to counsel and further evidence Defendants' pattern of deliberately circumventing the Pradia family's clearly and repeatedly invoked right to representation.

## H. Tainted Search Warrant and Unlawful Search of Storage Unit

103. During the June 3 administrative meeting, Chief Carter informed Geoffrey Pradia that a search warrant issued by Ellis County Justice of the Peace, Precinct 1, Judge Chris Macon had been executed on Plaintiffs' storage unit on June 1, 2026. When Geoffrey Pradia later inspected the storage unit, he found his firearms placed on top of appliances, a property receipt, and a copy of the warrant. A bag containing implements — paddles, belts, and straps — had been seized and characterized in the warrant as potential evidence of child abuse.

104. The characterization of these implements as evidence of child abuse was made in bad faith. Chief Carter had actual, prior knowledge that the implements in question were used exclusively within Plaintiffs' consensual adult relationship and had no connection whatsoever to the discipline of their children. This knowledge predated Geoffrey Pradia's hiring by the Garrett Police Department and had been discussed directly between Chief Carter and both Plaintiffs. Chief Carter had additionally been shown video documentation confirming the consensual adult context of the implements' use. Despite this actual knowledge, Chief Carter did not disclose it to Ellis County investigators or take any action to correct the false characterization of the seized items as evidence of child abuse. The warrant was therefore sought and executed based on a characterization that the referring officer knew to be false. Chief Carter was not alone in that knowledge. The consensual adult use of these implements within Plaintiffs' marriage was also widely known to other City officials, to members of the community, and to Dewart herself, including persons who thereafter participated in, or supplied information for, the investigation. Because those persons knew the actual purpose of the implements, no reasonable person with

that knowledge could have believed that the implements were used on the children, and the characterization of them as evidence of child abuse cannot be explained as an honest mistake. Plaintiffs allege, upon information and belief, that the characterization instead reflects a coordinated and retaliatory effort to inflame the investigation by recasting lawful, private conduct as child abuse.

105. The seizure of these implements, and the criminal investigation premised upon them, has caused Plaintiffs severe and ongoing harm to their constitutionally protected privacy interests. As a direct and proximate result of the unlawful search and the bad-faith characterization of the seized items, Plaintiffs have been compelled to disclose intimate videos, private writings, and other deeply personal materials to their criminal defense attorney in order to defend against allegations that Chief Carter knew to be without foundation. The compelled disclosure also encompassed unpublished manuscripts, draft writings, and preparatory materials that Geoffrey Pradia has been developing for books and blog content on the subject of consensual adult domestic discipline — creative works in progress that had been selectively shared only for limited private review and had not yet been released to the public. The forced disclosure of these unpublished works into adversarial legal proceedings deprived Geoffrey Pradia of control over creative output he had not yet chosen to release, exposed pre-publication intellectual property, and has caused harm to his prospective professional reputation and future publishing prospects. This compelled disclosure of protected intimate and professional materials — necessitated entirely by Defendants' unconstitutional conduct — constitutes an independent and ongoing violation of Plaintiffs' privacy rights and a distinct element of compensable damages.

106. The bag of implements was placed in the storage unit by Plaintiffs Geoffrey and Kassi Pradia on the evening of May 28, 2026, at approximately 10:00 p.m. This fact is documented on video. The last authorized access to the storage unit by Dewart prior to May 28 occurred approximately two weeks earlier — at which time the bag was not present in the unit. Dewart therefore could not have known the bag existed in the storage unit through any lawful means.

107. Upon information and belief, the search warrant was obtained through information derived from two separate unauthorized entries into Plaintiffs' storage unit by Dewart, neither of which Plaintiffs authorized. First, at some point after May 29, 2026, Dewart accessed the storage unit without Plaintiffs' permission to return Geoffrey Pradia's firearms to the unit. It was during this unauthorized entry — or a related unauthorized entry — that she observed the bag of implements that had been placed there on May 28. Second, having observed the bag through that unlawful access, Dewart reported its presence to law enforcement investigators, who used that information to obtain the search warrant. Because Dewart's prior authorized access to the unit had expired and was never renewed, and because the bag did not exist in the unit during any period of her authorized access, any information she provided to investigators about the bag's presence could only have been obtained through her unauthorized entry into the storage unit.

## I. Improper Internal Affairs Allegations (June 4, 2026)

108. On June 4, 2026, Geoffrey Pradia's CLEAT attorney reviewed the internal affairs paperwork provided by Chief Carter. The attorney identified that the IA allegations included "Truthfulness and cooperation during investigations," which improperly referenced Geoffrey Pradia's invocations of his right to counsel during the criminal and CPS investigations. An

officer cannot be disciplined for asserting constitutional rights. After the attorney contacted the City Attorney, the City verbally stated it would withdraw this allegation. As of the filing of this Complaint, no amended IA documentation has been provided to Geoffrey Pradia. The City's failure to amend the Internal Affairs paperwork, after stating that it would do so, shows that the Internal Affairs investigation was opened and maintained in retaliation for Geoffrey Pradia's assertion of his right to counsel. Critically, Chief Carter served as the internal affairs investigator in his own right — investigating an officer whose retaliatory placement on administrative leave, improper IA allegations, wage withholding, and interference with outside employment Chief Carter himself directed and orchestrated. This creates a direct, irreconcilable conflict of interest: Chief Carter is simultaneously the alleged wrongdoer, the complainant, and the investigator.

### J. Withheld Wages, Economic Retaliation, and Continuing Harm (May 29, 2026 to the Present)

109. When Geoffrey Pradia was placed on administrative leave on May 29, 2026, he was explicitly told the leave would be paid. The administrative leave paperwork reflected that he would receive his regular pay. However, the City of Garrett failed to pay Geoffrey Pradia any wages for a substantial period, despite requiring him to remain available during his normal duty hours, restricting him from working in any law enforcement capacity, and prohibiting him from working off-duty employment. Wages were eventually paid only after significant delay; the City characterized the non-payment as an oversight. Regardless of characterization, the delayed payment caused Plaintiffs significant financial hardship, impaired their ability to meet financial obligations on time, and negatively impacted their ongoing credit repair efforts. Geoffrey Pradia is the sole financial provider for the Pradia household. Kassi Pradia is a stay-at-home mother responsible for the care of four minor children, including an infant who was thirteen months old and nursing at the time.

110. Chief Carter was personally aware of this family structure — that Geoffrey Pradia was the household's sole source of income, that Kassi Pradia did not work outside the home, and that the family had no secondary income to fall back upon in the event Geoffrey Pradia's wages were withheld or his outside employment was restricted. Chief Carter was also specifically aware of the off-duty hours Geoffrey Pradia worked at Point Blank Safety and the financial purpose those hours served — namely, ensuring that the family's bills were paid and that the household remained financially stable. This awareness is directly relevant to the economic coercion analysis: Chief Carter's decision to simultaneously place Geoffrey Pradia on administrative leave, withhold his wages, and contact Point Blank Safety to restrict or eliminate his off-duty employment was made with actual knowledge that those combined actions would deprive the family of its only source of income, creating immediate and severe financial hardship for a household with four minor children, including an infant who was then nursing, and no alternative means of support.

111. The resulting financial strain — which Chief Carter knew would predictably follow from his actions — caused Plaintiffs to fall behind on financial obligations, damaged their ongoing credit repair efforts, and compelled them to pawn personal property to meet basic household expenses. Chief Carter's awareness of the financial impact his actions would have on the Pradia family, combined with his deliberate decision to proceed with those actions, is directly relevant to the punitive damages analysis and to the economic coercion element of the First Amendment retaliation claim. As a direct and proximate result of the withheld wages and the prohibition on outside employment, Plaintiffs were compelled to pawn personal property in order to meet basic financial obligations, including household expenses and recurring financial commitments that could not be deferred. The forced liquidation of personal property at below-

market pawn values constitutes a concrete, calculable economic loss directly attributable to Defendants' conduct, separate from and in addition to the lost wages themselves.

112. As a further direct and calculable consequence of his administrative leave status, Geoffrey Pradia was denied eight hours of holiday pay for Memorial Day, which fell during the period of his administrative leave. An officer on active duty status would have received that holiday compensation as a matter of course; the administrative leave directly caused its loss. In addition, Geoffrey Pradia accrued compensatory time prior to the commencement of his administrative leave that he was unable to use as a result of his leave status, representing an additional concrete economic loss. The loss of Memorial Day holiday pay and the inability to utilize accrued compensatory time constitute separate, calculable economic damages directly and proximately caused by Defendants' unconstitutional conduct. Additionally, as a direct and proximate result of the financial hardship caused by Defendants' withholding of wages and the emotional, psychological, and practical burdens imposed by the retaliatory investigation and its consequences, Kassi Pradia was compelled to withdraw from her undergraduate studies at Thomas Edison State University, where she was an enrolled student pursuing a degree at the time of the events described herein.

113. Kassi Pradia's forced withdrawal from her degree program constitutes a distinct and concrete educational harm — including the loss of academic progress, the loss of tuition and fees paid for the interrupted term, and the delay or potential permanent disruption of her educational and professional goals — that is directly and proximately caused by Defendants' unconstitutional conduct. The harm caused by the delayed payment, the resulting forced disposal of personal property, and the forced educational withdrawal is not cured by the eventual issuance of wages.

114. Geoffrey Pradia was also forced to withdraw from his undergraduate studies at Thomas Edison State University as a direct and proximate result of the financial hardship and the burdens imposed by Defendants' conduct, causing him educational harm, including lost academic progress and delay or disruption of his educational and professional goals.

115. On June 17, 2026, while Geoffrey Pradia remained on administrative leave, Chief Carter contacted Point Blank Safety — a business with which Geoffrey Pradia held off-duty employment — and inquired whether Geoffrey Pradia was working off-duty shifts with them. As a direct result of this contact, Geoffrey Pradia was compelled to contact Point Blank Safety and be removed from approximately twenty scheduled future shifts. Prior to Chief Carter's contact, Geoffrey Pradia had already been forced to forgo approximately ten shifts as a consequence of the administrative leave and off-duty employment prohibition. In total, Chief Carter's conduct caused Geoffrey Pradia the loss of approximately thirty off-duty shifts at Point Blank Safety, representing a calculable and direct economic harm attributable to Defendants' retaliatory conduct. This contact constitutes active interference with Geoffrey Pradia's outside employment relationship, exceeded any legitimate administrative purpose, and served to further chill and surveil Geoffrey Pradia's economic activity while he remained under employment-based coercion. It also demonstrates that Chief Carter's restrictions on off-duty employment were not merely incidental conditions of administrative leave but were actively monitored and enforced as instruments of economic pressure.

116. The delayed payment of wages, combined with the requirement of availability, the prohibition on other employment, and Chief Carter's active surveillance of Geoffrey Pradia's off-duty employment through his June 17, 2026 contact with Point Blank Safety, caused concrete financial harm to Plaintiffs before any remediation.

117. Chief Carter's awareness of Geoffrey Pradia's pending application to the San Saba County Sheriff's Office — disclosed to him directly on May 28, 2026, the day before all investigations commenced — provides critical context for the retaliatory nature of the actions that followed. Geoffrey Pradia was not an officer seeking to create conflict; he was actively pursuing a professional transition on good terms, with Chief Carter's knowledge and participation. Chief Carter knew Geoffrey Pradia intended to leave the Garrett Police Department and was taking concrete steps toward that end. Despite this knowledge, Chief Carter used his authority over the internal affairs process and the criminal investigation to initiate and perpetuate proceedings that foreseeably place Geoffrey Pradia's San Saba application in jeopardy. An active internal affairs investigation and a pending criminal matter — both orchestrated by the very supervisor who knew Geoffrey Pradia was applying elsewhere and had personally assisted him in gathering his application documents — constitute professional harm that extends far beyond the Garrett Police Department.

118. Geoffrey Pradia was denied the San Saba position — the San Saba County Sheriff's Office never responded to his application after the events described herein — as a direct and proximate result of Defendants' retaliatory conduct, constituting a distinct and ongoing element of economic and professional damages separate from and in addition to the wage and off-duty employment losses described above. Equally significant, both Chief Carter and Lieutenant Brewer were informed during the week of May 14, 2026 — two weeks before the events of May 29, 2026 — that Kassi Pradia had submitted an application for a presidential pardon and that the application was then under active review by the Office of the Pardon Attorney. The retaliatory investigation initiated and escalated by Defendants foreseeably jeopardizes Kassi Pradia's pending pardon application, as pardon reviews consider the conduct

and circumstances surrounding the applicant, and the generation of adverse criminal findings, investigative referrals, or law enforcement records through a bad faith investigation could directly and irreversibly damage the pardon review process.

119. The harm to Kassi Pradia's presidential pardon application — including any adverse impact on the review caused by Defendants' unconstitutional conduct — constitutes a distinct, ongoing, and potentially irreversible element of compensable damages that is separate from and in addition to all other harms alleged herein. Notably, the manipulation campaign orchestrated by Dewart against the Pradia children included the explicit statement that Kassi Pradia would "never get her pardon," reflecting awareness of the pending application by persons connected to or coordinating with those responsible for the retaliatory campaign, and further corroborating the deliberate and coordinated nature of the scheme against the Pradia family.

120. Since May 29, 2026 — a period of approximately four and one-half months as of the filing of this Complaint — Geoffrey Pradia has been unable to work in law enforcement. He was first barred from duty and from off-duty law enforcement work during the administrative leave, and, after his June 26, 2026 resignation, no law enforcement agency has hired him.

121. Since May 29, 2026, Geoffrey Pradia has been denied employment by, or has received no response from, every law enforcement agency to which he has applied. This includes the San Saba County Sheriff's Office, to which Geoffrey Pradia was preparing to transfer immediately before the events of May 29, 2026, and which has never responded to his application. These denials compound the financial harm described above and show that adverse and retaliatory action has been taken against Geoffrey Pradia that has severely damaged his career.

122. As of the filing of this Complaint, Geoffrey Pradia has not obtained employment with any law enforcement agency. Upon information and belief, this is a direct result of statements made by Chief Carter or other City officials, and of materials placed in Geoffrey Pradia's Garrett Police Department personnel and employment file as a result of the investigations described herein, which have caused prospective employers to decline to hire him. Plaintiffs reasonably believe that Chief Carter or other City officials have placed negative, inflammatory, and unfounded statements in that file or in information provided for hiring and background purposes. Geoffrey Pradia's complete personnel file will be sought in discovery.

123. Geoffrey Pradia also applied for unemployment benefits and was denied because of the circumstances of his separation from the City of Garrett, although he resigned under the hostile and retaliatory conditions described above. Upon information and belief, when the City of Garrett was contacted about the terms of his separation, it stated that he left voluntarily, which impeded his claim. As of the filing of this Complaint, Geoffrey Pradia is still seeking relief from the unemployment agency.

124. As a direct and proximate result of the stress of the investigations, the forced seizure and detention of Kassi Pradia, the psychological harm to the Pradia children, and the family's resulting displacement from its home, which left it staying with family and friends, Kassi Pradia suffered from mastitis from July 2026 through the beginning of August 2026. Kassi Pradia suffered with the condition for more than two weeks before she required treatment at a hospital. This physical injury is a distinct element of the damages caused by the events described herein.

125. Plaintiffs no longer felt safe living in Garrett after May 29, 2026 and, to a greater extent, were unable to afford their basic bills because of the financial damage the events

described herein caused them. The family therefore had to leave its home and is presently staying with family and friends. As a direct and proximate result of that displacement, the family lost all of its pets, consisting of its dogs and its cat, which would not have been lost had the family not been forced from its home. The loss of those animals caused Plaintiffs economic loss and caused the Pradia children further psychological harm.

126. Since these events, the Pradia family has begun family counseling through their faith community. Plaintiffs' oldest child, A.H., has suffered severe trauma and serious psychological distress as a direct result of the events described herein, including the manipulation of A.H. by, and the betrayal of her trust by, her aunt, Dewart; the allegations made against her parents in the investigations; the financial hardship and displacement the investigations caused her family; the forced interview of A.H. by Corporal Houston on May 29, 2026; and the forensic interview conducted in the DFPS/CPS investigation. The harm to A.H. is serious enough that she is receiving ongoing counseling and professional support. This harm is a distinct element of the damages suffered by the Pradia family.

**K. Additional May 29 Violation Discovered June 22, 2026 — Attempted Removal of Minor Child**

127. On June 22, 2026, Plaintiff Geoffrey Pradia learned from his minor daughter that on May 29, 2026 — the same day as the initial warrantless entry — Ellis County Sheriff's Office deputies had separately attempted, without parental consent and without a court order, to persuade the minor daughter to enter their patrol vehicle and travel with them to an alternative location for an interview, without notifying or obtaining the consent of either parent. This conduct occurred on May 29, 2026 and was unknown to Plaintiffs until the daughter disclosed it on June 22, 2026.

## L. Disclosure of Third-Party Manipulation (May 31 and June 15, 2026)

128. On May 31, 2026, Geoffrey Pradia received a call from the father of a friend of the Pradia family's oldest daughter, reporting statements the daughter had made. When Plaintiffs sat down with their children, the oldest daughter disclosed the full scope of Dewart's manipulation as described in paragraphs 33 through 36 above. The children showed visible signs of trauma and distress as they disclosed what they had been told and what they had been instructed to do.

129. On or about June 15, 2026, neighbor William Brent Rogers informed Plaintiffs that Josie Holdridge had approached him on the afternoon of May 29, 2026 and told him directly that she had contacted the Sheriff's Office and that it was Dewart who had told the children to go to her and ask that the police be called. This statement corroborates the coordinated nature of the false report and the absence of any good-faith basis for the initial law enforcement response.

## M. Closure of the DFPS/CPS Investigation

130. As of the filing of this Complaint, the DFPS/CPS investigation of the Pradia family has been closed. In the course of that investigation, a forensic interview was conducted of the Pradia family's oldest child.

131. Upon information and belief, the forensic interview established that Dewart coached, manipulated, and threatened the Pradia children, that no child made any outcry of abuse, and that the children had been manipulated by Dewart into seeking out the neighbor. Upon information and belief, DFPS found no evidence of abuse and closed its investigation for that reason. Plaintiffs are still waiting to receive the official DFPS/CPS closure paperwork and will supplement this allegation upon receipt.

132. Plaintiffs allege that the closure of the DFPS/CPS investigation confirms that each investigation directed at the Pradia family on and after May 29, 2026 rested on a report procured under false pretenses, and that the investigations were without any factual foundation.

## N. October 10, 2026 Destruction of No-Trespassing Signs

133. Around September 3, 2026, Plaintiffs placed no-trespassing signs on the gates of their property at 401 W. Wyatt Street.

134. On October 10, 2026, at approximately 10:00 p.m., Plaintiffs returned to their property to check on it. They found that the no-trespassing signs had been cut and removed from their gates on the side of the fence that faces Holdridge's property. Those were the only signs that had been tampered with; the signs facing the street were left intact.

135. Plaintiffs made a police report to the Garrett Police Department for the destruction of their property and sent evidence to Lieutenant Brewer, who stated that he would write the report. As of the filing of this Complaint, Lieutenant Brewer has not provided a case number for the report, has not followed up on the report, and has not advised Plaintiffs whether a criminal trespass warning was issued to the neighbors, which Geoffrey Pradia specifically requested. Plaintiffs allege that this inaction is consistent with the pattern, described above, in which the Garrett Police Department has declined to act on Plaintiffs' complaints.

## O. Summary of the Retaliatory Course of Conduct and Reservation of Rights

136. The following summary of the retaliatory timeline is provided to assist the Court in understanding the pattern of conduct alleged herein and to establish the factual predicate for each cause of action that follows. Geoffrey Pradia is a Texas Peace Officer holding a TCOLE Intermediate Proficiency Certificate, with direct firsthand knowledge of the Garrett Police Department's written policies, standard operating procedures, and actual enforcement customs

— including the custom and practice of animal ordinance enforcement as he personally observed and applied it during his tenure with the Department. He has also worked directly with Ellis County Sheriff's Office investigators in the field and has professional familiarity with their policies and procedures. Based on that knowledge and experience, Geoffrey Pradia affirmatively alleges as follows.

137. First, in the two years preceding May 2026, Geoffrey Pradia personally responded to and handled multiple dog at large complaints as a Garrett Police Department officer. In none of those incidents were vaccination records requested from the animal owner, and no departmental policy, written or unwritten, required such a request in connection with a dog at large complaint. Chief Carter's representation that vaccination records were always requested following dog incidents is directly contradicted by the actual enforcement practice that Geoffrey Pradia observed, participated in, and implemented as a sworn officer of the same department.

138. Second, when Chief Carter first conveyed Mayor Newsom's February 19, 2026 directive to Geoffrey Pradia, Carter personally purchased and provided Geoffrey Pradia with an electric fence box to assist with compliance — demonstrating that Carter himself did not at that time view the fence situation as warranting punitive enforcement, and that the subsequent citation was a product of mayoral direction rather than independent officer judgment.

139. Third, on February 23, 2026, Geoffrey Pradia hired local handyman Anjel Mendez to professionally repair the electric fence at 401 W. Wyatt Street. The fence functioned properly from that date through May 26, 2026 — a period of over ninety days — with the sole exception of temporary weather-related interference consistent with the known operating characteristics of electric fencing. The May 26, 2026 escape was caused by storm damage, lasted

less than five minutes, involved no public safety impact, and was followed by immediate recovery of the animal and prompt repair.

140. Fourth, the demand for vaccination records — asserted by Chief Carter on May 12, 2026 as a longstanding departmental practice — was in fact a novel enforcement measure never previously applied to Geoffrey Pradia and, upon information and belief, not uniformly applied to other Garrett residents. The vaccination records demand originated with Josie Holdridge's complaint to Public Works Director Don Lewis, made in direct retaliation for Geoffrey Pradia serving Holdridge with a notice to relocate a gas meter that was on Plaintiffs' property. That complaint was transmitted by Lewis to Carter and Newsom, who directed its enforcement against Plaintiffs exclusively.

141. Fifth, Mayor Newsom had prior knowledge of the conflict between Plaintiffs and Holdridge through multiple channels, including but not limited to the May 1, 2026 phone call from Geoffrey Pradia, the TikTok and Facebook statements by Holdridge made while she was a sitting Council member, and numerous text message communications between Mayor Newsom and Holdridge, between Mayor Newsom and Geoffrey Pradia, and between Chief Carter and Holdridge and/or Mayor Newsom, which upon information and belief exist and will be sought through open records requests and discovery, and which demonstrate both Chief Carter's and Mayor Newsom's actual prior knowledge of the conflict, the retaliatory motive, and the prior threat to make a false child abuse report.

142. Taken together, these facts establish a coordinated, premeditated campaign of retaliation against Plaintiffs by City of Garrett officials — beginning no later than February 19, 2026 and continuing through the filing of this Complaint — that was driven by Holdridge's

animus, facilitated by her relationships with City officials, and executed through the deliberate misuse of law enforcement and regulatory authority.

143. **RESERVATION OF RIGHTS — RACE, ETHNICITY, AND RELIGION.** Plaintiffs are an interracial family. Geoffrey Pradia is Black and Kassi Pradia is White and Native American. The Pradia family practices a faith tradition that is private and not publicly disclosed. Plaintiffs respectfully reserve the right to assert additional claims under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution based on race, ethnicity, and/or religion, and under the Free Exercise Clause of the First Amendment based on religion, should discovery reveal evidence supporting those claims. The following facts are currently of record and are relevant to this reservation.

144. First, the Pradia family is an interracial household in a small Texas municipality, and the campaign of harassment, enforcement, and investigation described in this Complaint was directed at that household by a neighbor and facilitated by City officials who were fully aware of the family's racial composition.

145. Second, on May 29, 2026, Deputy Tracy Hightower independently and without prompting asked both Geoffrey Pradia and Kassi Pradia — separately — whether they believed that Josie Holdridge's conduct toward them was motivated in any way by race or ethnicity. Deputy Hightower's unprompted inquiry reflects a contemporaneous law enforcement perception that race or ethnicity may have been a motivating factor in the conduct giving rise to this Complaint.

146. Third, Holdridge's social media history, text message communications, and other records to be obtained through discovery and open records requests may contain statements or content reflecting racial, ethnic, or religious animus toward the Pradia family.

147. Fourth, the communications between Mayor Newsom and Holdridge, between Chief Carter and Holdridge, and between other City officials and Holdridge — which upon information and belief exist and will be produced in discovery — may reveal that race, ethnicity, or religion played a role in the animus underlying the campaign against Plaintiffs.

148. Plaintiffs do not assert race, ethnicity, or religion-based Equal Protection or Free Exercise claims as standalone counts at this time, as discovery has not yet been conducted and Plaintiffs are committed to asserting only claims supported by the evidentiary record. However, Plaintiffs expressly reserve the right to seek leave to amend this Complaint pursuant to Federal Rule of Civil Procedure 15(a) to add such claims upon the completion of discovery or upon the disclosure of any evidence reflecting racial, ethnic, or religious animus by any Defendant or by Josie Holdridge in connection with the events described herein. Defendants are hereby on notice of this reservation.

## IV. NOTICE AND DEMAND FOR PRESERVATION OF EVIDENCE

149. Defendants are hereby placed on notice of the claims asserted in this Complaint. The City of Garrett, Ellis County, and each individual Defendant, together with their respective officers, deputies, employees, agents, and representatives, are under a continuing duty to preserve all documents, electronically stored information, and tangible things that are relevant to the claims and defenses in this action, whether or not favorable to the preserving party. Plaintiffs give this notice in addition to, and not in place of, any duty that arose earlier by operation of law, and Plaintiffs rely on Federal Rule of Civil Procedure 37(e) and the Court's inherent authority with respect to any failure to preserve.

150. This duty requires each Defendant to suspend any routine retention schedule, automatic deletion or overwriting function, or destruction practice that would affect the evidence

described below, and to preserve electronically stored information in its original, native format with all associated metadata, including information stored on City-issued, County-issued, and personal devices and accounts that were used to communicate about the matters alleged in this Complaint.

151. **Body-worn and in-car camera recordings.** Defendants must preserve all body-worn camera, dash camera, in-car camera, and other audio and video recordings made by any officer, deputy, investigator, or other employee of the Garrett Police Department or the Ellis County Sheriff's Office on May 29, 2026 at or near 401 W. Wyatt Street, Garrett, Texas, including all footage depicting the seizure of Kassi Pradia, the entry onto the gated property, the interview of the Pradia children, the attempt to remove the oldest child from the property, and the encounter with Geoffrey Pradia; all recordings made at the Garrett Police Department on May 29, 2026 and June 3, 2026; and all recordings of any interview of Geoffrey Pradia or Kassi Pradia. This includes complete, unedited originals, all audit and access logs, and all chain-of-custody records for each recording.

152. **Police reports, dispatch records, and calls.** Defendants must preserve the original incident, offense, and supplemental reports concerning the May 29, 2026 incident, together with every draft, revision, supplement, and audit trail; all computer-aided dispatch records, dispatch logs, and radio traffic; all 911 and non-emergency calls, including the recordings, logs, and caller information for every call made by Josie Holdridge or any other person that led to or concerned the law enforcement response to 401 W. Wyatt Street; and all records of any report, referral, or communication made to or received from the Texas Department of Family and Protective Services.

153. **Correspondence and communications.** Defendants must preserve all correspondence and communications of any kind — including emails, text messages (SMS, MMS, and iMessage), messages sent through any messaging or social media application, voicemails, letters, memoranda, and social media posts, comments, and tags — that refer or relate to Plaintiffs, to 401 W. Wyatt Street, to Josie Holdridge, Dewart, or Steurer, or to any event alleged in this Complaint. This includes communications among or between Mayor Newsom, Chief Carter, Lieutenant Brewer, Public Works Director Don Lewis, Corporal Houston, Deputy Hightower, Investigator Potempa, Sergeant Fitzgerald, Sheriff Norman, and Josie Holdridge, and communications between any Defendant and the Texas Department of Family and Protective Services, Dewart, Steurer, Point Blank Safety, the San Saba County Sheriff's Office, any other prospective employer of Geoffrey Pradia, or any unemployment agency.

154. **Personnel, Internal Affairs, and payroll records.** Defendants must preserve the complete Internal Affairs file for IA-26-00004, including all notices, allegations, drafts, and amendments; the written Notice of Administrative Leave With Pay and all drafts; the June 25, 2026 closure memorandum; the June 10, 2026 department-wide memorandum and its drafts; Geoffrey Pradia's complete personnel, payroll, leave, holiday-pay, and compensatory-time records; all records concerning the timing and cause of the delayed payment of his wages; all communications concerning the offer of his position to Baldemar Sanchez or any other person; all employment verifications, references, and background-check responses provided to any prospective employer; and all communications concerning his separation from employment and his claim for unemployment benefits.

155. **Animal-ordinance enforcement records.** Defendants must preserve all records of complaints, citations, warnings, and demands for vaccination records concerning dogs in the City of Garrett from January 1, 2024 to the present, including the February 19, 2026 directive, the May 12, 2026 demand, and the May 26, 2026 citation and written warning; all policies and communications concerning vaccination enforcement and pet registration; the June 22, 2026 "Garrett Talk" post and all drafts; all records of Josie Holdridge's complaints to Public Works Director Don Lewis or any other City official, including those concerning the gas meter; all code-enforcement records, notices, complaints, and communications concerning the height of grass or landscaping on Plaintiffs' property and on other Garrett properties from January 1, 2024 to the present; and the Garrett Police Department's social media accounts, posts, tags, comments, and messages, including Josie Holdridge's May 1, 2026 post in which the Department was tagged.

156. **Investigative and warrant records.** Defendants must preserve the complete investigative files of the Garrett Police Department and the Ellis County Sheriff's Office, including all notes, statements, and recordings; the application, affidavit, warrant, return, inventory, and property receipts for the search of Plaintiffs' storage unit on or about June 1, 2026; all photographs and video of that search; the chain of custody for all seized items; all communications with the issuing court concerning the warrant; and all communications with Dewart, Steurer, or any other person who provided information about the storage unit.

157. **Policies, training, and personnel records.** Defendants must preserve all written policies, standard operating procedures, general orders, training materials, and training records of the Garrett Police Department and the Ellis County Sheriff's Office concerning child-abuse and welfare-check investigations, entry onto private property, interviews of minors, compelled

statements by employees, body-worn camera use and retention, animal-ordinance and vaccination enforcement, and the intake and handling of citizen complaints, together with the training, disciplinary, complaint, and internal affairs records of each individual Defendant.

158. **October 10, 2026 report.** Defendants must preserve all records of Plaintiffs' report of the destruction of their no-trespassing signs, including any computer-aided dispatch entry, incident or case number, report, photographs, and evidence submitted by Plaintiffs, and all communications with or by Lieutenant Brewer concerning the report and any criminal trespass warning.

159. Plaintiffs further give notice that they intend to request preservation of relevant evidence from non-parties, including Josie Holdridge, Dewart, Steurer, the Texas Department of Family and Protective Services, Point Blank Safety, the San Saba County Sheriff's Office, and the agency that adjudicated Geoffrey Pradia's claim for unemployment benefits, and to seek that evidence by subpoena under Federal Rule of Civil Procedure 45 as necessary. Plaintiffs have preserved, and will continue to preserve, the relevant evidence in their own possession, custody, or control, including recordings, photographs, correspondence, social media content, and documents.

160. Any failure to preserve the evidence described above may result in sanctions, including an adverse-inference instruction, exclusion of evidence, or other relief available under Federal Rule of Civil Procedure 37(e) and the Court's inherent authority. Plaintiffs reserve the right to seek an order of this Court compelling preservation should it become necessary.

## V. CAUSES OF ACTION

### COUNT I — FOURTH AMENDMENT: UNLAWFUL SEIZURE OF KASSI PRADIA

(42 U.S.C. § 1983 — Against Corporal Jacob Houston, Deputy Tracy Hightower, and Ellis County)

161. Plaintiffs incorporate by reference paragraphs 1 through 8, 10, 14 and 15, 33 through 36, 55 through 70, 124, and 126 through 129 above as if fully set forth herein, as they relate to this Count.

162. A person is seized within the meaning of the Fourth Amendment when a government actor, by means of physical force or a show of authority, restrains the person's freedom of movement and a reasonable person would not feel free to leave. See Torres v. Madrid, 592 U.S. 306 (2021); United States v. Mendenhall, 446 U.S. 544 (1980).

163. On May 29, 2026, Corporal Jacob Houston physically seized Kassi Pradia without probable cause, without a warrant, and without any lawful justification: he grabbed her, physically removed her from her own property, handed her to Deputy Tracy Hightower, and threatened arrest if she resisted. Kassi Pradia had committed no offense. The seizure was objectively unreasonable.

164. Also on May 29, 2026 — as Plaintiffs learned on June 22, 2026 from their minor daughter's disclosure — deputies additionally attempted to physically remove the minor daughter from the property into their patrol vehicle without parental consent, constituting a further unlawful seizure on that same date.

165. Deputy Tracy Hightower participated in these seizures by receiving and detaining Kassi Pradia and by failing to intervene to stop the unlawful conduct despite being present and aware of the constitutional violations.

166. These seizures were carried out under color of state law and directly caused Kassi Pradia physical contact, emotional distress, trauma, and deprivation of liberty. At the time of her unlawful seizure on May 29, 2026, Kassi Pradia was the breastfeeding mother of a thirteen-month-old infant. The forced separation of a nursing mother from her infant without lawful basis caused immediate and foreseeable physical discomfort to Kassi Pradia and urgent distress to the infant — both direct and proximate consequences of the unlawful seizure for which Defendants are responsible, and both constituting distinct elements of compensable harm separate from and in addition to the other damages described herein. Both Chief Carter and Lieutenant Spencer Brewer were aware of Kassi Pradia's vulnerability, past trauma, and legal history at the time they directed and participated in her seizure on May 29, 2026, which is directly relevant to the objective unreasonableness of their conduct and to the punitive damages analysis for the individual capacity defendants. Ellis County is liable under Monell for these actions, as described in Count XI.

## COUNT II — FOURTH AMENDMENT: UNLAWFUL ENTRY INTO RESIDENTIAL CURTILAGE

(42 U.S.C. § 1983 — Against Corporal Jacob Houston, Deputy Tracy Hightower, and Ellis County)

167. Plaintiffs incorporate by reference paragraphs 1 through 8, 10, 14 and 15, 33 through 36, 55 through 70, and 126 through 129 above as if fully set forth herein, as they relate to this Count.

168. The curtilage of a home — the area immediately surrounding and associated with the home — receives the full protection of the Fourth Amendment. A closed, gated fence is a clear demarcation of curtilage. See Florida v. Jardines, 569 U.S. 1 (2013). Warrantless entry onto

curtilage is presumptively unconstitutional absent a recognized exception. See Gates v. Tex. Dep't of Protective & Regulatory Servs., 537 F.3d 404 (5th Cir. 2008).

169. On May 29, 2026, after physically removing Kassi Pradia and over her explicit objection, Corporal Jacob Houston passed through the Pradia family's closed, gated property and entered the curtilage of their home without a warrant, without valid consent, and without exigent circumstances. A CPS complaint alone does not create exigency sufficient to override Fourth Amendment protections. See Gates, 537 F.3d at 421.

170. Plaintiffs further learned on June 22, 2026 that on May 29, 2026, deputies had also attempted to remove the minor daughter from the curtilage of the property into a patrol vehicle without parental consent — an additional warrantless intrusion into the Pradia family's protected residential space occurring on that same date.

171. These entries were carried out under color of state law and caused Plaintiffs injury including invasion of their protected residential space, unlawful interrogation of their children, and associated emotional distress.

## COUNT III — FOURTH AMENDMENT: UNLAWFUL SEIZURE OF PERSONS — DENIAL OF ACCESS

(42 U.S.C. § 1983 — Against Corporal Jacob Houston, Deputy Tracy Hightower, Investigator Michael Potempa, Sergeant Joseph Fitzgerald, Michael Carter, and Lieutenant Spencer Brewer)

172. Plaintiffs incorporate by reference paragraphs 1 through 8, 10, 12 through 17, 33 through 36, 55 through 73, 92 through 102, and 126 through 129 above as if fully set forth herein, as they relate to this Count.

173. Geoffrey Pradia was seized in a manner tantamount to arrest on at least three separate occasions. First, on May 29, 2026, Defendants Houston and Hightower barred Geoffrey Pradia from his own property and from his minor children, threatened him with arrest if he did

not walk away, and permitted him to see his children only under police escort, so that he was not free to enter his home or to exercise his property and parental rights; Kassi Pradia was likewise physically confined outside the gate. As Plaintiffs learned on June 22, 2026, deputies also attempted that day to remove their minor daughter from the property without consent. Second, on the evening of May 29, 2026, Chief Carter telephoned Geoffrey Pradia and directed him to come to the Garrett Police Department to comply with the demands of DFPS caseworkers, and held him there, in the presence of those caseworkers and his own Chief of Police and under the threat of employment consequences, as alleged in paragraph 72. Third, on June 3, 2026, Chief Carter, Lieutenant Brewer, and Investigators Potempa and Fitzgerald ambushed Geoffrey Pradia, who had been told that he was coming to sign Internal Affairs paperwork, by confronting him with a criminal interview before giving him that paperwork, and then sequestered him inside the Department while Kassi Pradia was interviewed outside, so that he could not aid his wife and was not free to leave. Each of these restraints, imposed by law enforcement officers and backed by the authority of Geoffrey Pradia's employment, was a seizure under the Fourth Amendment for which no lawful basis existed.

## COUNT IV — FOURTH AMENDMENT: UNLAWFUL SEARCH AND SEIZURE — STORAGE UNIT

(42 U.S.C. § 1983 — Against Investigator Michael Potempa, Sergeant Joseph Fitzgerald, and Ellis County)

174. Plaintiffs incorporate by reference paragraphs 1 through 8, 10, 12, 16 and 17, 33 through 36, and 92 through 108 above as if fully set forth herein, as they relate to this Count.

175. A search warrant that is obtained on the basis of information derived from a prior unlawful search is itself tainted, and evidence obtained pursuant to such a warrant is inadmissible

as fruit of the poisonous tree. See Wong Sun v. United States, 371 U.S. 471 (1963); Segura v. United States, 468 U.S. 796 (1984).

176. The search warrant executed on Plaintiffs' storage unit was obtained using information derived from unauthorized entries into the storage unit by a third party acting without Plaintiffs' consent, as described in paragraphs 106 through 107 above. The items seized were characterized as evidence of child abuse despite Chief Carter's actual prior knowledge that they were used exclusively within Plaintiffs' consensual adult relationship and had no connection to their children. The warrant was therefore tainted both by the unlawful means through which the information was obtained and by the bad-faith characterization provided by the referring officer. The resulting search and seizure were unconstitutional. As alleged in paragraph 104, the true purpose of the implements was known to Chief Carter, other City officials, members of the community, and Dewart, which undermines any claim that the characterization was made in good faith.

177. This search caused Plaintiffs harm including: the seizure of personal property; the escalation of a criminal investigation based on tainted evidence and a knowingly false characterization; the invasion of Plaintiffs' constitutionally protected privacy interests in their consensual adult relationship; the compelled disclosure of intimate videos, private writings, and personal materials to criminal defense counsel solely to rebut allegations Chief Carter knew to be without foundation; and the forced disclosure of unpublished manuscripts, draft writings, and preparatory materials Geoffrey Pradia has been developing for future publication — works in progress selectively shared only for limited private review — depriving him of control over pre-publication creative output and harming his prospective publishing prospects. See Lawrence v. Texas, 539 U.S. 558 (2003).

## COUNT V — FIFTH, FOURTH, AND FOURTEENTH AMENDMENTS: COMPELLED SELF-INCRIMINATION (GARRITY VIOLATION) AND UNLAWFUL SEIZURE OF GEOFFREY PRADIA

(42 U.S.C. § 1983 — Against Michael Carter, Investigator Michael Potempa, Sergeant Joseph Fitzgerald, City of Garrett, and Ellis County)

178. Plaintiffs incorporate by reference paragraphs 1 through 10, 12, 16 and 17, 71 through 102, and 108 above as if fully set forth herein, as they relate to this Count.

179. Under Garrity v. New Jersey, 385 U.S. 493 (1967), a government employee cannot be compelled to choose between self-incrimination and loss of employment. Statements made by an officer under such coercion are constitutionally compelled and may not be used against the officer in any criminal proceeding.

180. On June 3, 2026, Chief Carter orchestrated a structure in which Geoffrey Pradia — who was on administrative leave subject to Internal Affairs allegations, including an allegation of lack of "Truthfulness and cooperation during investigations" — was directed to submit to a criminal interview with Investigators Potempa and Fitzgerald before completing the IA notification process. This created an environment in which Geoffrey Pradia reasonably believed that refusal to answer questions would result in adverse employment consequences, including termination. The investigators continued questioning despite Geoffrey Pradia's explicit invocation of his right to counsel.

181. Any statements made by Geoffrey Pradia during the June 3 criminal interview were unconstitutionally compelled and may not be used against him in any criminal proceeding. Defendants are liable for engineering this coercive structure.

182. On June 3, 2026, Chief Carter summoned Geoffrey Pradia back into the Garrett Police Department and directed him to remain inside while Kassi Pradia was interviewed outside. That directive seized Geoffrey Pradia's person in a manner tantamount to arrest, in violation of the Fourth Amendment. Chief Carter was Geoffrey Pradia's commanding officer and

the chief law enforcement officer of the department, and Geoffrey Pradia, who was on administrative leave and subject to Internal Affairs allegations, knew that refusing or declining to comply could bring adverse employment consequences, including termination. Under the totality of the circumstances, the combination of Chief Carter's law enforcement authority and the employment consequences of refusal or declination created a coercive environment in which no reasonable person would have felt free to leave. Upon information and belief, that environment was designed to separate Geoffrey Pradia from Kassi Pradia, to prevent Plaintiffs from invoking and asserting their rights, and to further the criminal investigation. No warrant, probable cause, or other lawful basis supported the restraint, and Defendants are liable for it. This restraint followed the ambush interview described in paragraph 92, in which Chief Carter, working with the Ellis County investigators, used Geoffrey Pradia's employment to compel his participation in a criminal interview.

183. The same conduct violated Geoffrey Pradia's rights under the Fourteenth Amendment. By conditioning Geoffrey Pradia's employment and the status of his administrative leave on his submission to a criminal interview, by using the authority of the Chief of Police to confine him and to keep him from assisting his wife, and by obtaining statements through that coercion, Defendants deprived Geoffrey Pradia of liberty and of a protected property interest in his employment without due process of law, and employed means that were fundamentally unfair and shocking to the conscience.

## COUNT VI — SIXTH AND FOURTH AMENDMENTS: DENIAL OF RIGHT TO COUNSEL AND UNLAWFUL SEIZURE OF KASSI PRADIA

(42 U.S.C. § 1983 — Against All Defendants Who Continued Questioning After Counsel Was Invoked, and Against Michael Carter and Lieutenant Spencer Brewer)

184. Plaintiffs incorporate by reference paragraphs 1 through 10, 12 through 17, 55 through 73, 92 through 102, and 108 above as if fully set forth herein, as they relate to this Count.

185. Once an individual invokes their right to counsel, all questioning by law enforcement must immediately cease. See Edwards v. Arizona, 451 U.S. 477 (1981).

186. Geoffrey Pradia invoked his right to counsel on May 29, 2026, during the DFPS evening meeting; on June 3, 2026, at the outset of the criminal interview with Investigators Potempa and Fitzgerald; and at multiple additional points throughout these encounters. Defendants disregarded each invocation and continued questioning.

187. Kassi Pradia invoked her right to counsel during the June 3, 2026 interview conducted by Investigators Potempa and Fitzgerald outside the Garrett Police Department. Investigators acknowledged she had an attorney and continued questioning her anyway.

188. Chief Carter's June 3 conduct also seized Kassi Pradia in a manner tantamount to arrest, in violation of the Fourth Amendment. Under the totality of the circumstances alleged in paragraphs 99 and 100, Chief Carter's confinement of Geoffrey Pradia inside the Garrett Police Department isolated Kassi Pradia, in a police-station parking lot, from the assistance of her husband and left her, with no means of leaving because she and Geoffrey Pradia had arrived together in one vehicle, facing two investigators who acknowledged that she was represented by counsel. Chief Carter's actions constituted a seizure of both Geoffrey Pradia and Kassi Pradia. A reasonable person in Kassi Pradia's position would not have felt free to leave or to decline the

interview, and no lawful basis existed for the seizure. Chief Carter, Lieutenant Brewer, who maintained the physical separation, and Investigators Potempa and Fitzgerald are liable for it.

189. Deputy Tracy Hightower violated this right on May 29, 2026 by refusing to stop the interview of the Pradia family's minor children after being informed of the family's represented status and after the attorney spoke with him directly. Lieutenant Spencer Brewer separately violated Plaintiffs' right to counsel on June 3, 2026 by participating in the administrative meeting at the Garrett Police Department and participating in or acquiescing in the confinement of Geoffrey Pradia inside the building while Investigators Potempa and Fitzgerald questioned Kassi Pradia outside — despite knowing that both Plaintiffs were represented by counsel. Brewer's participation in maintaining the physical separation of Geoffrey from Kassi, with actual knowledge of her represented status and her vulnerability, past trauma, and legal history, constitutes direct personal participation in the denial of Kassi Pradia's right to counsel during the June 3 encounter and extends his individual liability under this Count beyond the May 29, 2026 events.

190. These violations caused Plaintiffs harm including the continued coercive investigation, the generation of statements under duress, and the escalation of proceedings based on information obtained in violation of Plaintiffs' constitutional rights.

## COUNT VII — FOURTEENTH AMENDMENT: EQUAL PROTECTION — SELECTIVE ENFORCEMENT

(42 U.S.C. § 1983 — Against Michael Carter, Lieutenant Spencer Brewer, Mayor Newsom, and City of Garrett)

191. Plaintiffs incorporate by reference paragraphs 1 through 9, 12 and 13, 18 through 32, 39 through 54, 66, 71 through 91, and 133 through 148 above as if fully set forth herein, as they relate to this Count.

192. The Equal Protection Clause prohibits government actors from applying laws and ordinances in a selectively discriminatory manner without a rational basis. Selective enforcement motivated by personal animus or political considerations violates the Fourteenth Amendment.

193. Defendants selectively enforced Garrett's dog ordinances against Plaintiffs while allowing other dog owners in the City — including owners of dogs that had roamed freely for over eighteen months — to operate without citation or vaccination record demands. Chief Carter's representation that vaccination records were always requested following dog incidents is contradicted by the City's own enforcement history. Defendants likewise demanded that Plaintiffs' property be brought up to code while, upon information and belief, taking no action to direct Holdridge to bring her own property into compliance, despite their actual knowledge that a tenant lived in a tiny house behind Holdridge's residence for which no certificate of occupancy had been issued. Beginning in July 2026, the City likewise targeted Plaintiffs' property for enforcement over the height of the grass, a form of enforcement that was not applied to other Garrett residents. Count VII rests on the vaccination-record demands, the code-enforcement demands, the grass-height enforcement, and Defendants' refusal to act on Plaintiffs' complaints about Holdridge. It does not seek relief that would invalidate the municipal-court disposition of the May 26, 2026 citation.

194. Defendants refused to issue a disorderly conduct citation to Holdridge for directing profane language toward Plaintiffs' minor children, while simultaneously directing enforcement against Geoffrey Pradia at Holdridge's apparent instigation and at the direction of the Mayor.

195. The selective enforcement was motivated by Defendants' accommodation of Holdridge — a sitting City Council member with a relationship to City officials — and their

animus toward Geoffrey Pradia arising from his constitutional invocations and his conflicts with Holdridge. Most significantly, Mayor Newsom and Chief Carter had actual prior knowledge, as early as May 1, 2026, that Holdridge had threatened to make a false report of child abuse against the Pradia family as a retaliatory act. Despite this knowledge, when Holdridge made exactly such a report on May 29, 2026, Defendants accepted it at face value, acted on it without scrutiny, and passed it to the Sheriff's Office without disclosing Holdridge's documented retaliatory history. A government actor who knowingly credits and acts upon a report from a person they know has previously threatened to make that very report — while simultaneously suppressing that context from the responding agency — engages in a deliberate denial of equal protection. This targeting, without rational basis and with actual knowledge of the complainant's retaliatory motive, violates the Equal Protection Clause.

196. The disparate treatment of Geoffrey Pradia is further illustrated by the City of Garrett's treatment of a similarly situated comparator. In December 2025, City of Garrett Public Works Director Don Lewis was arrested. Despite this arrest, Don Lewis experienced no adverse employment action whatsoever as a result of that arrest. He was not placed on administrative leave, was not subjected to an internal affairs investigation, did not have his wages withheld, and was not restricted in any aspect of his employment. By contrast, Geoffrey Pradia — who was never arrested and was merely accused, based on an uncorroborated report from Josie Holdridge, a neighbor with whom he had a long-documented history of mutual complaints and harassment in both directions — was immediately placed on administrative leave, subjected to a formal internal affairs investigation, had his wages withheld for a substantial period, was barred from off-duty employment, had his off-duty employer contacted directly by Chief Carter, and was ultimately constructively discharged.

197. The disparity between the City's treatment of Don Lewis, an actual arrestee who received no adverse employment consequence, and its treatment of Geoffrey Pradia, who was never arrested and was the subject only of an uncorroborated and ultimately unsubstantiated accusation from a person with documented retaliatory motive, cannot be explained on any rational or good-faith basis. This disparity is direct evidence that the adverse actions taken against Geoffrey Pradia were not the product of a neutral, evenhanded application of City personnel policy to similarly situated employees accused of or actually engaged in misconduct, but were instead targeted specifically at Geoffrey Pradia because of his constitutionally protected conduct and his conflict with Holdridge, in violation of the Equal Protection Clause.

## COUNT VIII — FOURTEENTH AMENDMENT: SUBSTANTIVE DUE PROCESS — PARENTAL RIGHTS AND FAMILY INTEGRITY

(42 U.S.C. § 1983 — Against All Defendants)

198. Plaintiffs incorporate by reference paragraphs 1 through 18, 33 through 36, 55 through 73, and 124 through 132 above as if fully set forth herein, as they relate to this Count.

199. Parents have a fundamental liberty interest in the care, custody, and control of their children, protected by the Fourteenth Amendment. See Troxel v. Granville, 530 U.S. 57 (2000); Santosky v. Kramer, 455 U.S. 745 (1982). Government intrusion into the parent-child relationship without a court order, without exigent circumstances, and without credible, corroborated evidence of abuse violates this fundamental right.

200. Defendants, acting jointly and in concert, intruded upon the Pradia family's constitutionally protected family integrity on May 29, 2026 and June 22, 2026, without a court order, without valid exigent circumstances, and without any credible evidence of abuse — acting instead on allegations originating from a neighbor with a documented retaliatory history and transmitted through children who had been subjected to weeks of coached manipulation by a

third party who was physically present during the children's interview. Geoffrey Pradia was also barred by armed officers from his own property and from his minor children on May 29, 2026, and was then compelled by his Chief of Police to appear at the Garrett Police Department that evening to comply with DFPS caseworkers.

201. The interview of the Pradia children without parental consent, the physical removal of Kassi Pradia from her children, the denial of the Pradia family's access to their children, the seizure of lawful parenting implements, and the escalation of a criminal investigation based on constitutionally protected parental discipline collectively violated Plaintiffs' substantive due process rights.

## COUNT IX — FOURTEENTH AMENDMENT: PROCEDURAL DUE PROCESS — DEPRIVATION OF WAGES

(42 U.S.C. § 1983 — Against Michael Carter and City of Garrett)

202. Plaintiffs incorporate by reference paragraphs 1 through 9, 12, 71 through 91, and 109 through 123 above as if fully set forth herein, as they relate to this Count.

203. A public employee has a protected property interest in earned wages and in the continuation of employment benefits promised by the government. The government may not deprive a person of a protected property interest without notice and an opportunity to be heard. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532 (1985).

204. Geoffrey Pradia was placed on paid administrative leave and told explicitly that he would continue to receive his regular pay. Despite this representation, the City of Garrett failed to pay Geoffrey Pradia his wages for a substantial period, without notice, without process, and without explanation, while simultaneously requiring him to remain available during his normal duty hours and prohibiting him from working in any other law enforcement capacity or off-duty employment. When wages were eventually paid, the City characterized the delay as an

oversight; however, the delay caused Plaintiffs significant financial hardship, impaired their ability to meet financial obligations on time, and negatively impacted their ongoing credit repair efforts. As a direct and proximate result of the withheld wages and the prohibition on outside employment, Plaintiffs were compelled to pawn personal property in order to meet basic financial obligations that could not be deferred. The forced liquidation of personal property at below-market pawn values constitutes a concrete, calculable economic loss directly attributable to Defendants' unconstitutional conduct.

205. As a further direct and calculable consequence of his administrative leave status, Geoffrey Pradia was denied eight hours of holiday pay for Memorial Day, which fell during the period of his administrative leave, and was unable to utilize accrued compensatory time earned prior to the commencement of the leave — both of which constitute separate, concrete, calculable economic losses directly and proximately caused by Defendants' unconstitutional conduct. Further, as a direct and proximate result of the financial hardship and the cumulative burdens imposed by the retaliatory investigation, Kassi Pradia was compelled to withdraw from her undergraduate studies at Thomas Edison State University, where she was an enrolled student at the time of the events described herein. Her forced withdrawal constitutes a distinct educational harm — including lost academic progress, lost tuition and fees, and delay or disruption of her educational and professional goals — directly attributable to Defendants' unconstitutional conduct. None of these harms are rendered moot by the eventual payment of withheld wages.

206. This deprivation — occurring without any process and causing concrete financial harm before eventual remediation — violated Geoffrey Pradia's protected property interest in his wages and constituted economic coercion designed to pressure him while he was subject to

investigation. The City's after-the-fact characterization of the non-payment as an "oversight" does not negate the constitutional violation or the compensable harm already suffered.

## COUNT X — FIRST AMENDMENT RETALIATION

(42 U.S.C. § 1983 — Against Michael Carter, Mayor Newsom, City of Garrett, and Ellis County)

207. Plaintiffs incorporate by reference paragraphs 1 through 126 and 133 through 148 above as if fully set forth herein, as they relate to this Count.

208. The First Amendment protects the right to petition the government for redress of grievances and to invoke constitutional rights without suffering adverse governmental action in response. Government retaliation for protected activity violates the First Amendment. See Hartman v. Moore, 547 U.S. 250 (2006).

209. Geoffrey Pradia engaged in constitutionally protected activity when he: (a) reported Holdridge's harassment to Mayor Newsom and sought redress; (b) requested that a complaint be filed against Holdridge; (c) asserted his family's right to counsel during the May 29 investigation; (d) demanded a court order before permitting deputies to interview his children; (e) refused to submit to interviews without legal representation; and (f) invoked his rights during the DFPS meeting.

210. Kassi Pradia engaged in constitutionally protected activity when she: (a) asserted her parental rights and objected to the interview of her children on May 29, 2026; (b) invoked her right to counsel during the June 3 interview; and (c) objected to deputies' attempts to interview her minor daughter without consent on May 29, 2026, as she later learned had occurred.

211. In direct response to these protected activities, Defendants took the following adverse actions: (a) placed Geoffrey Pradia on administrative leave within minutes of his

invocation of counsel before DFPS; (b) included an improper IA allegation targeting his constitutional invocations; (c) orchestrated a coercive criminal interview under threat of employment consequences; (d) delayed payment of Geoffrey Pradia's wages, causing significant financial hardship and harm to Plaintiffs' credit repair efforts; (e) barred Geoffrey Pradia from off-duty employment; (f) conducted the internal affairs investigation through Chief Carter himself — the very officer who initiated the retaliatory actions — rather than referring the matter to a neutral third-party investigator, creating a structural conflict of interest that denied Geoffrey Pradia impartial process; (g) contacted Geoffrey Pradia's off-duty employer Point Blank Safety on June 17, 2026, directly causing the loss of approximately thirty off-duty shifts and inflicting calculable economic harm beyond the administrative leave itself; (h) repeatedly returned to the Pradia home to conduct interviews without authorization; (i) refused to act on any complaint filed by the Pradia family while acting promptly on every complaint filed by Holdridge; (j) published a community-wide Facebook post on June 22, 2026 — three days before the IA closure — announcing the Department's vaccination enforcement policy in terms that directly contradict the enforcement action taken against Geoffrey Pradia, suggesting a post hoc attempt to legitimize a targeted and pretextual enforcement campaign by framing it as a uniform community policy; and (k) maintained the underlying investigation in open status for an unreasonable period of time — well beyond any period justifiable by the evidentiary record — in the absence of any outcry by the Pradia children, any physical evidence of abuse, any credible corroborating evidence independent of the complainant's retaliatory motivation, or any court order authorizing continued investigative action, thereby maintaining Geoffrey Pradia's administrative leave and off-duty employment restriction indefinitely and using the procedural

status of the open investigation as a mechanism of ongoing financial coercion against a sole provider with four minor children, including an infant who was then nursing.

212. The deliberate prolongation of the investigation without evidentiary justification, with actual knowledge of the Pradia family's financial vulnerability, constitutes a continuing retaliatory adverse action independent of and in addition to each discrete act enumerated above, for which Defendants are liable on a continuing basis through the date of trial.

213. The close temporal proximity between each constitutional invocation and the adverse action that followed demonstrates retaliatory motive. These actions would chill a person of ordinary firmness from exercising their constitutional rights.

## COUNT XI — MONELL LIABILITY: OFFICIAL POLICY, CUSTOM, AND FAILURE TO TRAIN

(42 U.S.C. § 1983 — Against City of Garrett and Ellis County)

214. Plaintiffs incorporate by reference paragraphs 1 and 2, 9 through 32, 39 through 107, and 136 through 148 above as if fully set forth herein, as they relate to this Count.

215. Under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), a municipality is liable under § 1983 when a constitutional violation results from: (a) an official policy; (b) a widespread custom; (c) a decision by a final policymaker; or (d) a failure to adequately train officers where the need for training was obvious and the failure amounted to deliberate indifference to constitutional rights. See City of Canton v. Harris, 489 U.S. 378 (1989).

216. The City of Garrett, through Mayor Newsom and Chief Carter — each a final policymaker — personally directed and authorized selective enforcement of ordinances against Plaintiffs, including the specific direction that the May 26 citation be issued "per the mayor." Mayor Newsom's direct authorization constitutes official policy.

217. Chief Carter, as a final policymaker: (a) refused to accept any complaint from the Pradia family regarding Holdridge's conduct; (b) placed Geoffrey Pradia on administrative leave in retaliation for asserting constitutional rights; (c) designed and executed the June 3 coercive interview structure; (d) coordinated with criminal investigators, and personally ordered Geoffrey Pradia to the station on May 29, 2026 to meet with DFPS investigators, in order to blend the administrative, criminal, and CPS proceedings and to use his authority over Geoffrey Pradia's employment to compel compliance with outside agencies; (e) withheld Geoffrey Pradia's wages without process; and (f) allowed or directed the continued harassment of the Pradia family through repeated warrantless contacts.

218. Ellis County, through the Ellis County Sheriff's Office, exhibited a custom and practice of disregarding Fourth Amendment constraints during CPS-related welfare checks, evidenced by: (a) warrantless entry into the Pradia family's curtilage on May 29, 2026; (b) the physical seizure of Kassi Pradia without cause on that date; (c) the continuation of interviews after counsel was invoked; (d) the attempt on May 29, 2026 to remove the minor daughter from the property into a patrol vehicle without parental consent, discovered by Plaintiffs on June 22, 2026; and (e) the failure of any supervisor to intervene despite the ongoing, obvious constitutional violations. The Sheriff's Office's own written policy preferring referral of minor interviews to the Ellis County Child Advocacy Center was violated without consequence. Sheriff Bruce "Brad" Norman, as the duly elected final policymaker for the Ellis County Sheriff's Office, is directly liable for these customs and practices under Monell, as they reflect the policies he established, permitted, or failed to correct.

219. The City of Garrett and Ellis County failed to adequately train their officers on: the Fourth Amendment rights of residential property owners and the curtilage doctrine; the right

of parents to be present during any interview of their minor children; the prohibition on continuing interviews after counsel is invoked; the requirements of Garrity v. New Jersey in combined administrative/criminal proceedings; and the restrictions on the use of CPS welfare-check authority to circumvent Fourth Amendment warrant requirements. The constitutional violations that occurred were the predictable and foreseeable result of these training failures.

220. Plaintiff Geoffrey Pradia, as a Texas Peace Officer holding an Intermediate Proficiency Certificate issued by TCOLE — which includes demonstrated proficiency in child abuse investigation protocols, constitutional law, search and seizure, and the legal standards governing law enforcement interaction with minors — has direct professional knowledge of the written policies and standard operating procedures of the Garrett Police Department and, through years of direct collaboration with Ellis County Sheriff's Office investigators in the field, has firsthand familiarity with the Ellis County Sheriff's Office's policies and procedures as applied in practice. Based on that professional knowledge and experience, Geoffrey Pradia affirmatively alleges that the conduct of Defendants on May 29, 2026 and June 3, 2026 deviated materially from the established policies of the Garrett Police Department and the Ellis County Sheriff's Office, from the requirements of Texas law governing child abuse investigations and law enforcement interactions with minors, and from the constitutional standards that officers of the Garrett Police Department and the Ellis County Sheriff's Office are trained and required to follow.

221. The departure from those established standards was not the product of reasonable professional judgment or good-faith error; it was the product of a deliberate decision by supervisors and final policymakers — including Chief Carter and Sheriff Norman — to disregard

constitutional requirements in pursuit of a retaliatory objective, which itself constitutes an unconstitutional policy or custom for purposes of Monell liability.

## COUNT XII — SUPERVISORY LIABILITY

(42 U.S.C. § 1983 — Against Michael Carter, Lieutenant Spencer Brewer, Corporal Jacob Houston, and Sheriff Bruce "Brad" Norman in Their Individual Capacities)

222. Plaintiffs incorporate by reference paragraphs 11 through 14, 39 through 108, and 136 through 148 above as if fully set forth herein, as they relate to this Count.

223. A supervisor is individually liable under § 1983 when: (a) the supervisor affirmatively participates in the constitutional violation; (b) implements an unconstitutional policy that results in the violation; or (c) demonstrates deliberate indifference by failing to take action in response to a known pattern of violations.

224. Chief Carter affirmatively participated in the constitutional violations described herein by: directing the retaliatory citation; refusing to accept the Pradia family's complaints; placing Geoffrey Pradia on retaliatory administrative leave; designing the coercive June 3 interview structure; confining Geoffrey Pradia within the Police Department to facilitate the unauthorized interview of Kassi Pradia; and withholding Geoffrey Pradia's wages. Chief Carter is subject to individual supervisory liability for each of these actions. Lieutenant Spencer Brewer affirmatively participated in the constitutional violations described herein across two separate dates. On May 26, 2026, Brewer issued the retaliatory citation directed by Mayor Newsom and Chief Carter and refused to accept a complaint from Plaintiffs regarding Holdridge's profane language directed at Plaintiffs' minor children. On May 29, 2026, Brewer participated in the physical seizure of Kassi Pradia and the warrantless entry onto Plaintiffs' property, with actual knowledge of Kassi Pradia's vulnerability, past trauma, and legal history.

225. On June 3, 2026, Brewer was present at the Garrett Police Department during the administrative meeting and participated in or acquiesced in the coercive interview structure that blended criminal and administrative proceedings, and participated in maintaining the physical separation of Geoffrey Pradia from Kassi Pradia during the concurrent outside interview of Kassi — preventing Geoffrey from informing Kassi that she did not have to participate in the interview, as he had already told the investigators that it was not an appropriate time to speak with Kassi while they were interviewing him, with actual knowledge that both Plaintiffs were represented by counsel and actual knowledge of Kassi's vulnerability, past trauma, and legal history. Lieutenant Brewer's participation in constitutional violations on May 26, May 29, and June 3, 2026 — across animal ordinance enforcement, the warrantless seizure of Kassi Pradia, and the coercive June 3 interview structure — establishes a pattern of individual conduct giving rise to personal supervisory liability on each of those dates and for each of those violations.

226. Corporal Jacob Houston directed and supervised the May 29 unlawful entry, the seizure of Kassi Pradia, and the warrantless interview of the Pradia children. He is subject to individual supervisory liability for each of these actions.

227. Sheriff Bruce "Brad" Norman, as the duly elected final policymaker for the Ellis County Sheriff's Office, is subject to supervisory liability for the constitutional violations committed by his deputies on May 29, 2026. Sheriff Norman established, permitted, or failed to correct the policies, customs, and training deficiencies that caused his deputies to: enter private residential curtilage without a warrant; physically seize Kassi Pradia without probable cause; interview minor children without parental consent or court order; continue questioning after counsel was invoked; and attempt to remove a minor child from her property without parental consent. The pattern of violations — occurring on the same date across multiple deputies acting

in concert — reflects a systemic failure of supervision and training for which Sheriff Norman bears personal responsibility as the office's final policymaker.

## COUNT XIII — FIRST AMENDMENT RETALIATION / CONSTRUCTIVE DISCHARGE

(42 U.S.C. § 1983 — Against Michael Carter, Mayor Newsom, and City of Garrett)

228. Plaintiffs incorporate by reference paragraphs 1 through 9, 12, 18 through 32, 37 through 54, 71 through 102, and 108 through 126 above as if fully set forth herein, as they relate to this Count.

229. A public employer may not constructively discharge an employee in retaliation for the exercise of constitutionally protected conduct, including the assertion of constitutional rights and the refusal to submit to unconstitutional investigative tactics. A constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, and the resignation is treated as the functional equivalent of a formal discharge for purposes of liability under 42 U.S.C. § 1983.

230. Defendants Chief Carter, Mayor Newsom, and the City of Garrett deliberately created and maintained working conditions for Geoffrey Pradia that a reasonable person would find intolerable, including: placing him on administrative leave premised on an investigation that was ultimately suspended for insufficient evidence; withholding his wages for a substantial period during that leave; eliminating his off-duty employment income through direct contact with his employer; subjecting him to a coercive interview structure implicating his Fifth and Sixth Amendment rights; conducting a search of his property based on mischaracterized evidence; publishing a department-wide policy memorandum during his leave containing provisions specifically relevant to his personal habits and inconsistent with his documented performance record; and offering his position to a volunteer officer during the period his wages

were withheld, demonstrating that Defendants did not intend for him to return to his position in any meaningful capacity.

231. On June 26, 2026, Geoffrey Pradia submitted his formal resignation, effective immediately, expressly citing the retaliatory and discriminatory actions of Defendants and the hostile working environment they created. A reasonable person in Geoffrey Pradia's position — a sole financial provider for a household of six, having endured the cumulative course of conduct described in this Complaint — would have felt compelled to resign rather than continue subjecting himself and his family to that conduct.

232. Defendants' conduct in constructively discharging Geoffrey Pradia was motivated by and in retaliation for his exercise of protected First Amendment activity, including his invocation of his right to counsel, his refusal to submit to unconstitutional questioning, his complaints regarding Holdridge's harassment, and his pursuit of alternative law enforcement employment, as more fully described in Count X above.

233. As a direct and proximate result of the constructive discharge, Geoffrey Pradia has suffered the loss of his career, his accrued seniority and benefits, his professional standing, and his past and future earning capacity, in an amount to be determined at trial.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Geoffrey Pradia and Kassi Pradia respectfully pray that this Court:

A. Enter judgment in favor of Plaintiffs and against Defendants on each Count as pleaded above;

B. Award Plaintiffs compensatory damages for all injuries and losses sustained, including but not limited to:

(a) physical injury and offensive touching sustained by Kassi Pradia, including the physical discomfort caused by her forced separation from her then thirteen-month-old nursing infant during her unlawful seizure and confinement on May 29, 2026, the distress caused to the infant by that separation, and the mastitis she suffered from July through early August 2026, which required hospital treatment;

(b) severe emotional distress and mental anguish suffered by both Plaintiffs, including the distress of witnessing the effect of Defendants' conduct on their minor children, and the costs of counseling and treatment;

(c) damage to the professional reputation and law enforcement career of Geoffrey Pradia, a decorated officer;

(d) loss of past and future wages, including off-duty employment income, and the loss of income resulting from Geoffrey Pradia's inability to obtain law enforcement employment since May 29, 2026;

(e) loss of wages and economic harm caused by the City of Garrett's failure to timely disburse Administrative Leave With Pay wages, during a period when Plaintiffs had no other income and Geoffrey Pradia was prohibited from off-duty employment;

(f) loss of eight hours of Memorial Day holiday pay that Geoffrey Pradia would have received as an active duty officer;

(g) loss of the ability to use compensatory time earned before the administrative leave began;

(h) economic losses from Plaintiffs' being compelled to pawn personal property at below-market values to meet basic financial obligations;

(i) educational harm to Kassi Pradia and Geoffrey Pradia arising from their forced withdrawals from their undergraduate degree programs at Thomas Edison State University, including lost academic progress, lost tuition and fees paid for interrupted terms, and delay or disruption of their educational and professional goals;

(j) losses resulting from the family's displacement from its home in Garrett, including the loss of all of the family's pets, consisting of its dogs and its cat;

(k) harm to Kassi Pradia's pending presidential pardon application, which was under active review at the time of the events described herein and of which Chief Carter and Lieutenant Brewer were informed during the week of May 14, 2026;

(l) interference with the Pradia family's right to family integrity and the parent-child relationship, including the forcible separation of a nursing mother from her infant without lawful basis;

(m) invasion of Plaintiffs' privacy interests in their consensual adult relationship, including the compelled disclosure of intimate videos, private writings, and personal materials to criminal defense counsel;

(n) harm to Geoffrey Pradia's prospective publishing prospects and creative livelihood arising from the compelled disclosure of unpublished manuscripts, draft writings, and preparatory materials;

(o) loss of career, accrued seniority, professional standing, and past and future earning capacity resulting from Geoffrey Pradia's constructive discharge from the Garrett Police Department on June 26, 2026, including accrued vacation time, sick days, and holiday compensation pay owed at separation;

(p) loss of unemployment benefits; and

(q) all other consequential and incidental damages in an amount to be determined at trial;

C. Award Plaintiffs punitive damages against each individual Defendant sued in his individual capacity, in an amount sufficient to deter future constitutional violations, based on conduct that was intentional, malicious, or undertaken with reckless indifference to Plaintiffs' clearly established constitutional rights;

D. Award Plaintiffs pre-judgment and post-judgment interest as allowed by law;

E. Award Plaintiffs their costs of court and, should Plaintiffs retain counsel, reasonable attorney's fees pursuant to 42 U.S.C. § 1988(b); and

F. Grant such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

### VII. DEMAND FOR JURY TRIAL

Pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

Dated: Oct. 15th, 2026

Respectfully submitted,


Geoffrey Pradia
Pro Se Plaintiff
4054 County Road 3323
Greenville, Texas 75402
Telephone: (210) 323-2151
Email: geoffreypradia4991@gmail.com

Kassi Pradia
Pro Se Plaintiff
4054 County Road 3323
Greenville, Texas 75402
Telephone: (318) 505-7129
Email: gkpradia@gmail.com

JS 44 (Rev. 04/21) (TXND 4/21)

# CIVIL COVER SHEET 3-26CV3609-Z

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

(b) County of Residence of First Listed Plaintiff Ellis County, Texas
*(EXCEPT IN U.S. PLAINTIFF CASES)*

(c) Attorneys *(Firm Name, Address, and Telephone Number)*

Plaintiffs proceeding Pro Se (no attorney):
Geoffrey Pradia (210) 323-2151, geoffreypradia4991@gmail.com
Kassi Pradia (318) 505-7129, gkpradia@gmail.com

## DEFENDANTS

City of Garrett, Texas; Ellis County, Texas; Bruce (Brad) Norman; Michael Carter; Lt. Spencer Brewer; Cpl. Jacob Houston; Dep. Tracy Hightower;

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

RECEIVED
OCT 15 2026
JJF
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

- ☒ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

**Other:**
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE DOCKET NUMBER

DATE SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # AMOUNT APPLYING IFP JUDGE MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b) County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c) Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II. Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.)**

**III. Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV. Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V. Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI. Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII. Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII. Related Cases.** This section of the JS 44 is used to reference related cases, if any. If a related case exists, whether pending or closed, insert the docket numbers and the corresponding judge names for such cases. A case is related to this filing if the case: 1) involves some or all of the same parties and is based on the same or similar claim; 2) involves the same property, transaction, or event; 3) involves substantially similar issues of law and fact; and/or 4) involves the same estate in a bankruptcy appeal.

**Date and Attorney Signature.** Date and sign the civil cover sheet.